Nott, J.,
delivered the opinion of the court:
The claimants in this case let their barges to the Quartermaster Department at an agreed rate of compensation for such periods as their services might be required for Government transports. After the barges had been a long time in service order of the Quartermaster-General was made known to the owners, in December, 1863, which required that new charter-parties should be executed differing in several material matters from the old ones, reducing the compensation, and retroactive in effect. The owners refused the proffered terms and demanded the discharge of their vessels. The Department refused to discharge them and refused to pay the original rates, and, moreover, refused to pay the reduced rates unless the new charters were executed. A protracted correspondence and relocated demands and refusals followed. The owners used all possible diligence, making their requests and demands of the Quartermaster-General and the Secretary of War as well as of inferior officers. At length, in May, 1864, finding all efforts to procure either payment or a return of their, vessels fruitless, they yielded to what seemed-to them necessity and agreed to make the new charters, doing so, however, under protest. They now insist that these new charters were extorted by duress of their property; that they were involuntarily executed under protest, and are wholly void. The suit is brought upon tlie original charter-parties, and the owners seek to'recover the difference of compensation, and also for certain marine casualties, as to which the defendants were insurers under the first charters but not under the second.
By an elaborate argument the claimants’ case has been likened to that of Clyde, (5 C. Cls. R., 134,) and it has been urged that the decision which this court then rendered is applicable to the present case. The principle of that decision was that where the defendants, by the terms of a charter-party, possessed the right of discharging a vessel at any time, and the Quartermaster-General issued an order which required that the vessel’s compensation be reduced or she be discharged, the *451 order became ingrafted upon the charter-party from the time that notice of it was given to the owner. If he left his vessel in the service after notice, it was held that he consented to the reduction as effectually as though it had been indorsed on the charter-party and mutually executed; but if notice was not given to him and he was left in ignorance of the order, there being nothing for him to assent to, no alteration was thereby effected, and the charter-rate of compensation remained unchanged. In Clyde’s case no new agreement was executed by the owner, and the only question was as to when he consented to an alteration of the original instrument; in this case the owners executed a new agreement, and, if it was their voluntary act, it is decisive of their rights. In short, they assented to everything or to nothing.
Conceding everything that the learned counsel for the owners has claimed as matter of fact; conceding that the Government officers refused to pay the agreed compensation; that they refused to discharge the vessels from its service; that they refused to pay the reduced compensation unless the new charter-parties were executed; and that the owners yielded solely to this pressure of property withheld- and compensation refused, it by no means follows that the harsh treatment which effected an undesired result was what the law knows as duress. Duress arises where one man forcibly and illegally withholds another man’s goods. In this case of withholding, the element of force was present, but the element of illegality was wanting. What the Government was legally bound to do was, not to return the vessels, but to pay their wages. The fact that the Government possessed an all-controlling power of retention, superior to all legal remedies, and the reasonableness of the claimants’ demands, and the perseverance with which they sought to procure payment of the money due to them or a return of their property, combine to mislead the mind into the belief that the compulsion was that which the law defines as duress, and the agreements such as the law regards as involuntary. But if the case be brought to the test of comparing it to a similar transaction between two ordinary persons, it will be found that the vessels were always rightfully in service by the terms of the original charter-parties, and that their retention was never in any sense illegal nor by virtue of the right of eminent domain. Let it be supposed that.such a person had chartered these vessels and *452 demanded a redaction of the agreed rates, and had done all the other compulsory acts complained of; what remedy would the owners have had against him that they did not have against the Government? Tile non-payment of the wages would not have voided the charters; the owners would not have been able to replevin the vessels; demanding the discharge of the vessels would not have created new relations between the parties. All that the owners could have done would have been to sue the delinquent charterer for the money he owed them. In like manner these claimants, in December, 1863, might have done precisely what they have done now; they might have brought an action on the original charter-parties to recover the agreed wages. Bub instead of pursuing their remedy at the proper time they entered into new agreements, which they then preferred to the delays and uncertainties of litigation. It is manifestly too late for them to pursue that remedy now. This much of their demand comes clearly within the decision in Mason's Case, (6 C. Cls. R., 57,) and cannot be sustained.
It follows from this that the liability of the defendants for the injuries sustained by the barge Perry, in 1864, must be determined by her second charter-party, which provided that the marine risk should be borne by the owners “when in service in loaiers usually navigated by barges, otherwise by the United States-." The injury was confessedly one of marine risk, but the waters of the Potomac had not been navigated by such barges before the war, though they were safe and suitable for barge-navigation. We are of the opinion that the charter-party intended to draw a distinction of substance, and that the intent which it ambiguously expresses was that when the barge should be taken into waters not safe and suitable for barge-navigation, such as on her voyage from Hew York to the Potomac, the marine risk should be borne by the charterers, but that when in waters suited to her size find structure it should be borne by her owners. Upon this construction of the insurance clause the claimants cannot recover.
As to the barge Gardiner, it is sufficient to say that the injury occurred under the original charter-party, which provided that “ the marine and all other risks” should be borne by the defendants.
As to the last item of damage, the deterioration of all the barges while in service, it arises under the new charter-parties, *453 which provided that the barges should be returned to the owners in isfew York “ in the same order as when received, ordinary xoear and tear, damage by the elements, collision at sea and in port excepted.” There are two prior covenants in the charter-party ; the one that the barges “ should be kept and maintained during the whole of the voyage,” &c., “ tight, staunch, strong, and well and sufficiently manned, victualed, tackled, appareled, and ballasted, and furnished in every respect fit for merchant-service at the cost and charge of their owners;” the other that the marine risk should be borne by the owners, while the war-risk was to be borne by the defendants.
To the majority of the court it seems clear that these covenants are not inconsistent with each other, and that due effect should be given to all. The owners may well have said, when they let their vessels, “We are willing to warrant their seagoing qualities and to assume such risks as can be covered by marine insurance, but you propose to take our vessels for an unlimited time under your own control, to send them we know not where, and to employ them in the transportation of we know not what; they may be hacked by soldiers, and stamped and gnawed by horses, and'jarred by artillery. Since you acquire . the right to send them where you please and use them as you please, and we surrender the right of rejecting a cargo or employment which might be injurious to them, you must assure us that they shall be returned to us in as good condition as you received them, ordinary wear' and tear and marine casualties and disasters excepted.” The contingencies anticipated by the contracting parties for the most part arose. When a marine disaster brought a vessel within the owners’ covenant to keep her tight, staunch, and strong, and in every respect fit for merchant-service, her time lost thereby was deducted from her earnings and her repairs were charged to her owners. Conversely, if the barges were not returned to their owners in the same order as when received, ordinary wear and tear and marine disasters excepted, the defendants should be held liable under their covenant.
The judgment of the court is that the claimants recover of the defendants the sum of $3,653.S5.