Booth, Chief Justice,
delivered the opinion:
The plaintiff is a New York corporation. In 1917 it was "the owner of and operating a shipyard, one fully equipped with the necessary facilities for repairing and altering ships. *79 The Government, acting through the Navy Department, was anxious in April, 1917, to secure the services and facilities of the plaintiff so that its present or future needs in this respect might be expeditiously supplied.
On April 9, 1917, the plaintiff executed a written contract, identified as #240, with the Navy Department, wherein it was stipulated that the plaintiff was to receive and perform such character of repair® and alterations as directed on such vessels as the Navy Department consigned' to its yard. Payment for work done and materials furnished was to be upon a cost-plus-ten per cent basis, and the detailed method of arriving at compensation on this: basis was provided for in the contract. A number of vessels were from time to time consigned to plaintiff’s yard and a vast volume of work was accomplished to the satisfaction of the department.
On September 22, 1919, while work under the contract was in progress, the plaintiff received from the Secretary of the Navy the following cancellation order:
“ GeNtlemeN 4. Contract Dept. 240, dated April 9, 1917, by and between you and the United States for repairs and. alterations to be made to vessels belonging to or in the service of the Government and all and every contract and/or agreement and/or order heretofore entered into between you and the United States as represented by the Navy Department, or any parties acting for or on behalf of the Navy Department, are hereby canceled, by direction of the President, and by virtue of the power and authority contained in the naval appropriation act approved March 4, 1917, and all acts supplementary thereto.
“ You will, at a later date, be notified of the just compensation fixed by the President to which you are entitled in accordance with the terms of the aforesaid acts of Congress.
“ You will please acknowledge the receipt of this letter.,r
On the date of the receipt of the cancellation order and thereafter the plaintiff ceased work under contract #240. The Government at the time was largely indebted to the plaintiff for work performed and materials furnished, and unpaid bills were then pending in the Navy Department for settlement. Nothing was done by the department in *80 reference to any of said unpaid bills until April 21, 1921, on which, date the plaintiff received from the solicitor of the department a letter, which we think should be quoted in this opinion. It is as follows :
“ GeNtlidmeN : The records of the department show the sum of $850,427.10 due you in final settlement under contract No. 240.
“ The Secretary of the Navy has now authorized the payment of the amount due.
“ The terms of the contract provide for final payment upon the execution of a release. A form of release is inclosed herewith, and return of same properly executed will expedite payment.
“ The release of a corporation should be executed under its corporate seal.”
Following the receipt of the above letter the plaintiff in several written communications set forth its claims for additional compensation due, and most vigorously protested against executing any form of release which would preclude it from asserting its claims for such additional amounts. An exchange of letters followed, communications to which we will be required later to refer in some detail, resulting finally in a refusal of the department to yield to plaintiff’s requests and protests, and the execution of the release by the plaintiff, as it claims, under duress, and the payment of the sum the department conceded as due it. This suit is for the recovery of the amount alleged as due under the contract which the Navy Department declined to pay, and, so far as the record discloses, also declined to consider.
The plaintiff’s petition alleges facts relied upon to justify a recovery upon the basis of an exercise by the Navy Department of such a degree of compulsion as to constitute duress in the execution of the final release set forth in Finding VIII. The defendant justifies the exaction of the release under the following provisions of the contract, viz: “ Final payments shall be made for work done on each vessel in due course after such work is finished and on the execution of a final release to the department, in such form and containing such provisions as shall be approved by the *81 Secretary of the Navy, of all claims against the United States arising tinder or by virtue of this contract.” The sequential events leading up to the execution of the release unfold a transaction of unusual character and one which clearly reflects not only a lack of willingness but a distinct protest against acceding to the Navy Department’s fixed determination to refuse to pay the plaintiff what was admittedly its due, until a final release of all demands against the United States was executed. The contract provided for monthly payments for the work in progress of completion and set out the method and manner of presenting bills for the same. This prescribed method was changed by the terms of a letter dated June 25, 1917 (Finding V), and was finally definitely settled by an express order from the Secretary of the Navy dated December 7, 1917, directing that all accounting should be in accord with the standard .form of repair contract adopted and used by the Shipping Board Emergency Fleet Corporation. For a while the plaintiff prepared its bills according to the methods ordered by the Navy Department. The contract required that the Secretary of the Navy should pass upon the items deducted from and disallowed by the local cost inspector stationed in plaintiff’s plant for the purpose of checking over plaintiff’s bills, the procedure finally resulting in the accumulation of bills, both approved and disapproved by the cost inspectors, of considerably over one million dollars pending and unpaid on September 22, 1919, the date on which the contract was canceled. The plaintiff had repeatedly requested action upon all of these bills, all of which had been before the department for a long time and were pending settlement when it received on April 21, 1921, the letter from the solicitor of the department — a year and seven months subsequent to the cancellation of the contract — that the sum of $850,427.10 was due it. Deprived of such a substantial sum of money for so long a period of time, and unable for lack of information to even speculate upon what sum might be allowed, the plaintiff from this and other embarrassing causes found itself in April, 1921, facing financial disaster. The Treasury Department had assessed against it an income tax of *82 approximately $1,200,000, and was threatening suit or dis-traint proceedings to collect. It was indebted to banks in sums totaling more than $200,000. Its business had receded from the acute demands of war to peace times and its necessity for immediate funds was not only pressing but vital to its existence. The greater portion of the amount due it from the department was reimbursement for actual outlay disbursed for labor and materials, and the department was fully aware of all these facts and conditions. Not only this, the fact is evident that the department had not observed its obligations in regard to the approval and payment of bills rendered by the plaintiff. Therefore, when the demand came to either execute a final release or forego the right to assert its pending claims amounting to nearly $250,000, the plaintiff protested. It set forth in written letters of protest the details of its demand, pointed out the injustice of exacting such a form of release, sought in every possible manner to secure a reversal of the department’s attitude, did this very thing on May 16, 1921, June 10, 1921, June 22, 1921, and finally, on June 27,1921, the day the release was signed, presented to the officials of the department a written protest in which, among other things, the plaintiff said: “ We sign the release proposed by you under protest, due to the fact that you are holding over $850,000 which you concede to be due, besides the other claims we have outstanding against you.” This protest the department declined to receive or file.
Aside from the plaintiff’s financial condition, which constitutes but one important factor in the record, the officials of the department continuously and persistently represented to it that failure to accept the proffered sum and sign the release would result in the entire amount being paid back into the Treasury on June 30, 1921, as the appropriation available lapsed on that date, and that thereafter the department could not tender any amount; that the effect of this would be long and tedious delay, requiring the plaintiff to procure the passage by Congress of a special jurisdictional act to sue the United States in the Court of Claims; that the court’s dockets were crowded and it would be years before *83 the case would be heard; that even in the event of a judgment, no interest was allowable thereon, and that taking into account the expense of lawyers’ fees, court costs, loss of use of the amount tendered and interest thereon, etc., the plaintiff would in the end suffer much greater loss than if it accepted the amount offered. It was under these conditions, set forth in greater detail in Finding VII, that the plaintiff signed the release and accepted the money.
The recent case of the Hazelhurst Oil Mill & Fertilizer Co. v. United States, 70 C. Cls. 334, involved the issue of duress, and the facts found are strikingly similar to the facts in this case. Judge Green, in an'exhaustive review of the authorities cited, clearly pointed out the rule established and to be followed. It is only essential to refer to the case, without going into detailed citations, as confirmatory of our opinion in this case. The Supreme Court in the case of Hartsville Oil Mill v. United States, 271 U. S. 43, 49, in deciding an issue of duress, used this language:
“ But a threat to break a contract does not in itself constitute duress. Before the coercive effect of the threatened action can be inferred, there must be evidence of some probable consequences of it to person or property for which the remedy afforded by the courts is inadequate.”
The decision of the Supreme Court in the above case was rested, we think, in part upon a failure of proof as to the proximate effect of the threat involved upon the plaintiff’s own business. The cases cited and commented upon in the Hazelhurst Oil Mill case (supra) disclose the extent to which the courts have gone in granting relief where plaintiffs under compulsion have executed documents or acceded to settlements manifestly illegal and otherwise involuntary. A great number of cases are cited in the briefs of counsel on both sides. We need not review them. The rule as to duress, indicated by the trend of authorities, has receded from its ancient strictness and has been accepted in numerous instances wherein it appeared that the parties were not on equal terms and no alternative existed except to submit to an illegal exaction or suffer irreparable injury to business.
*84 The Supreme Court in Swift Company v. United States, 111 U. S. 22, 28-29, a case involving an illegal exaction by officials of the Internal Revenue Department, used this significant language:
“ The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law and could only do as they required. Money paid or other value parted with, under such pressure, has never been regarded as a voluntary act within the meaning of the maxim, volenti non fit injuria.”
We italicize the words “ voluntary act.” It is true in the Swift case the plaintiff in this court first sought to recover money illegally exacted from it. Nevertheless, the principle seems applicable where money has been illegally withheld from one to whom it is due.
In so far as the essential element of voluntary action is involved, the findings in this case indisputably establish a series of written protests, supplemented by oral ones, which remove all doubt as to the plaintiff’s accession to the execution of the release from any other motive than compulsion. Did then the officials of the department possess a legal right to unqualifiedly demand the release? Wo think not. The contract had been canceled under the act of June 15, 1917, and if not there was no authority residing in the officials to terminate it by cancellation. The department not onty ignored but denied the plaintiff its rights under the law. Just compensation was never fixed by the President, and no sum whatever as such tendered the plaintiff. It was told to take what the department said was its due or take nothing. Again, the critical situation in which the plaintiff found itself is attributable in whole to •the department’s course of conduct and proceedings. The contract was canceled on September 22, 1919, at a time when the department was greatly indebted to the plaintiff. The department gave no attention to plaintiff’s repeated requests for settlement and it received no assurances or information with respect thereto until February 2, 1920, when it was advised that the matter of the settlement of its claims would be referred “ during the present week ” to the Court of Claims as to the legal sufficiency of the contract. This, *85 of course, was never done, and was in no sense essential. St. Louis Hay & Grain Co. v. United States, 191 U. S. 159; Ackerlind v. United States, 240 U. S. 531. There was no legal impediment of sufficient consequence to have caused any delay, and the officials of the department must have so known. That they did know is demonstrated by the fact that no such action was ever taken. The plaintiff did not again hear from the department until April 21, 1921, one year and seven months, as we previously observed, after the contract was canceled. It is not said or pretended that the settlement offered on this date includes an adverse determination as to the allowance of the claims involved in this suit, and of course the proffered release would incite discussion. All that was said constituted an acknowledgment of indebtedness to the extent specified. This demand and the department’s attitude carried the plaintiff, in virtue of the department’s conduct, to June 27, 1921, three days prior to the lapsing of the available appropriation, and thereby made available to the department a compelling inducement to force the plaintiff into accepting its unqualified terms of settlement. The record exhibits no fact and the legal authorities disclose no rule of law which demanded such a settlement as the dex>artment exacted. A prolonged period of time had elapsed before the department decided to settle at all, and there was no circumstance of fact or law which prohibited the department from paying from available funds what was admittedly due, and delaying consideration of the remaining claims to a later final settlement. This sudden haste for a fonal settlement is left unexplained in the record. The contract did not exact it and the law did not compel it. We recite it, when taken into consideration with the attending facts and circumstances existing on the date the release was executed, as indicative of the anxiety as well as unreasonable willingness to seize upon and press the adverse condition in which the plaintiff found itself at the time as effectual means to procure the end the department desired, irrespective of the merits of the transaction. We say this advisedly, for the record establishes without contradiction that the officials of the department in charge of the matter volunteered and emphasized by way of oral *86 statements the inadequacy of any available legal remedy by means of which the plaintiff might in court recover more than the sum offered without in the end suffering a greater , loss than the loss embraced within the offered settlement. Kegardless of the accuracy or inaccuracy of the representations made by the officials of the department, it was obviously no part of their duty to press the plaintiff into acceding to their position or employ argumentation to secure its signature to the release. On the contrary, it seems to us that a legal duty devolved upon the department to protect rather than impede the plaintiff’s rights, especially so when the settlement offered the plaintiff was simply the payment of an admitted indebtedness, which should have been long since discharged. The facts warrant the conclusion that plaintiff’s protests were disregarded and a sufficient degree of compulsion appertained to divest the transaction of that voluntary character essential to free it from the charge of duress. A protest in whatever form manifested is evidence of positive disagreement as to the legality or inclusive scope of a document to which the protestant affixes his signature, a lack of acquiescence in the proceedings as a wholé. Protest almost universally saves rights and indicates, as in this case, a course of procedure to. which the plaintiff yielded without assenting in toto thereto. “ Every case of protest involves a submission to terms required, as well as a reservation of legal rights, and notice of this to the other party, and it is only the submission to terms required that makes the necessity for the protest, or any occasion for it.” Silliman v. United States, 12 C. Cls. 433, 454.
The Supreme Court in St. Louis, Brownsville & Mexico Railway Co. v. United States, 268 U. S. 169, 174, said:
“No action of these officials can bar the right of a claimant to have the Court of Claims determine whether he is entitled to recover under a contract with the Government. * * * The right to invoke the legal remedy may be lost by the claimant’s failure to invoke it within the statutory period of limitations. But the substantive right to recover an amount confessedly, due can be lost only through some act or omission on the part of the claimant which, under the rules of the common law as applied by this court *87 to claims against the Government, discharges the cause of action. * * * Acquiescence can be established by showing conduct before the pajnnent which might have led the Government to believe that the amount allowed was all that was claimed, or that such amount, if paid, would be received in full satisfaction of the claim. Acquiescence can also be established by showing conduct after the payment -which might have led the Government to believe that the amount actually received was accepted in full satisfaction of the original claim. But to constitute acquiescence within the meaning of this rule, something more than acceptance of the smaller sum without protest must be shown. There must have been some conduct on the part of the creditor akin to abandonment or waiver or from which an estoppel might ariseP (Italics inserted.)
See also Southern Pacific Co. v. United States, 268 U. S. 263; Southern Pacific Co. v. United States, 62 C. Cls. 649; United States v. Whiting, 17 Fed. (2d) 693.
It is true the defendant declined to receive or file the protest tendered on the day the release was signed, but it is also true that the officials demanding the execution of the release had on file and were fully aware of the written protests antedating the release, and were beyond peradventure fully cognizant that the plaintiff was yielding to their demand under circumstances clearly indicating a lack of acquiescence therein.
The Government relies upon a number of cited cases, two of which are cited as especially apposite. Silliman v. United States, 101 U. S. 465, and United States v. William Cramp & Sons Co., 206 U. S. 118. In the Silliman case the plaintiff in 1863 entered into several charter parties with the Government by the terms of which the latter acquired the use of certain barges. On June 2, 1863, the Quartermaster General arbitrarily and without warrant of law reduced the amount of compensation to be paid the plaintiff under the provisions of the charter parties and. demanded the execution of new ones. Conferences in Washington followed and negotiations obtained involving-the return of the barges and payment of deferred installments due, finally culminating in a proposition being submitted by the plaintiff to the Quartermaster General in. which the plaintiff agreed to accept the terms and condi *88 tions of a new charter party with the modifications proposed. The Quartermaster General accepted the proposition except as to the date of taking effect. Thereafter during conferences between the parties the plaintiff protested against executing the new charter parties unless the date proposed by it was inserted, but finally executed the new charter parties and thereafter was paid and received without protest or objection the full compensation stated in the new charter parties during the entire period of time they remained in Government service. In December, 1868, the plaintiff filed his petition in this court, seeking to recover the difference between the charter party rate prescribed in the original and the new charter parties, alleging the invalidity of the latter on the grounds of duress. The decision of both this (12 C. Cls. 433) and the Supreme Court was adverse to the contention and the petitioner lost the case. The Supreme Court disposed of the issue by pointing out that notwithstanding the reprehensible conduct of the Government officials the plaintiff failed to .stand upon his contract rights and pursue the remedy available in this court to recover the compensation due under the original contracts, contenting itself with entering into a new contract and accepting its terms. This case, we think, presents no such issue. Here we have a debtor offering in final settlement a payment of a part of the debt only, and extorting from the creditor a release of the entire debt. The creditor was to perform no additional service; the sums due had been earned and withheld, the transaction had been completed, and all that remained to be done was to pay according to the contract, without any intervening events changing materially the liabilities of the parties under the law. In the Silliman case the plaintiff continued free from protest to accept payments for the use of some of the vessels as late as August, 1865. There were no such overwhelming incidents of compulsion as prevailed in the present case, for the Government could not have retained the vessels and escaped liability for their use during the war.
In the Cramp case (supra) the plaintiff entered no protest to the execution of a final release, in words similar to the one *89 in suit. On the contrary, the plaintiff’s case was predicated exclusively upon the contention that the release did not include an unliquidated damage claim which the department was without legal authority to consider. No issue of compulsion or duress arose or was considered.
In the second Cramp & Sons case, 216 U. S. 494, 499, 503, wherein a release precisely like the one in the first case appeared, with the single exception of an added proviso in the following terms: “ That this release shall not be taken to include claims arising under the said contract other than those which the Secretary of the Navy had jurisdiction to entertain,” in reversing the decision of this court and awarding the plaintiff judgment the Supreme Court used this exceedingly pertinent language:
“ Evidently from his letter of February 13, 1901, the Secretary was of the opinion that, equitably, there was something due to the company, and yet, realizing that that question was not one for his determination, in order that full justice might be done, he consented to a change in the terms of the release, and this he had the power to do.”
In the instant case the Navy Department did not advise the plaintiff and has not contended in the record that the amount offered it in final settlement was all the Government owed under the contract. On the contrary, the officials of the department emphasized and repeatedly pointed out to the plaintiff that while it might suffer a loss in accepting the terms of settlement, it would hazard a much greater loss if it declined. Assuredly from what was said in the second Oramf case power resided in the Secretary to recognize this plaintiff’s rights and give heed to its protest in the matter of the terms of the release.
The Carlo De Luca case, 69 C. Cls. 262, has no application here. The facts alleged were insufficient to constitute duress or establish fraud. The specific allegations of the petition, the case being decided upon demurrer, amounted to no more than the pursuit by the Shipping Board of an established policy of the same in making settlements of the kind involved with all owners of contracts to build ships wherein the contracts had been taken by the Government during the war. In the De Luca case the plaintiff, almost *90 twelve years after tbe settlement had been accepted, was obviously seeking to take advantage of the decision of the Supreme Court in the Brooks-Scanlon case, 265 U. S. 106, decided May 12, 1924, which reversed the policy of settlement theretofore adopted by the board. Clearly in the Be Luca case the officers of the board offered the plaintiff the full amount offered to all others in a similar situation, and did not seek to induce the plaintiff to accept it. The plaintiff’s rights were neither jeopardized nor foreclosed by what was said or done, for at the time payment was made neither party knew for certain what the basis of the same should be. In this case no such doubt or possible uncertainty exists.
In the case of Freund v. United States, 260 U. S. 60, 67, 70, the Supreme Court reversed the decision of this court (56 C. Cls. 15) awarding plaintiff substantial damages in a case similar in principle to the instant case. The plaintiff had entered into a written contract with the Post Office Department, and given bond for its performance, to transport the mails to and from the new city post office in St. Louis, Mo., and incoming and outgoing trains. The service was to be compensated for upon a mileage basis and extended from July 1, 1911, to July 1, 1915. The new post-office building was not completed and ready for occupancy for sixteen jnonths after July 1, 1911, and during this period the department, acting as claimed under a specific provision of the contract authorizing it to vary, increase, or decrease the trips on this route, or extend the trips to any new location of the post offices, etc., restated the service to be performed under the contract, and over the plaintiff’s protest imposed a service, while like in character, greatly exceeding in volume and expense of performance the service contemplated by plaintiff’s contract. Not only was no heed accorded plaintiff’s protest, but the department advised him that if the restated service was not performed under his contract, it would be readvertised and suit instituted upon plaintiff’s bond for any damages suffered. Reluctantly yielding under protest to the department’s demands, and standing in fear of the consequences of nonperformance, the *91 plaintiff performed the restated service and the Supreme Court awarded a judgment therefor. In so deciding, the following excerpts from the opinion are apropos:
“ The department merely took advantage of general words in the appellants’ contract to meet an emergency presented by the delay in finishing the new post office * * * to thrust this entirely new task upon the appellants here.”
Again—
“ The contractors protested to the Second Assistant Postmaster General, to the postmaster at St. Louis, and to one Porter, a representative of the department at St. Louis, saying that they were not required to perform this service by the terms of the contract because it was entirely different from that contemplated; and that they would be ruined financially.”
And finally—
“ Then the only course open to them was either to engage the old contractor’s equipment at a heavy loss or throw up the original contract and run the risk of the Government’s reletting at a higher bid and charging the possible heavy difference in cost to it against them on their bond for a five-year contract. We can not ignore the suggestion of duress there was in the situation or the questionable fairness of the conduct of the Government, aside from the illegality of the construction of the contract insisted on, * *
Beyond doubt the plaintiff might have refused to perform the restated service and availed itself of the remedy provided in section 145 of the Judicial Code, a suit in this court. While the contract in the instant case provided for a release, the erected obligations were to be construed fairly and administered justly. It was never the intention of the contract that the release provision should be employed as a means to force a protesting creditor to abandon his rights and surrender claims of substantial amounts in order to procure what was admittedly due.
In Union Pacific Railroad Co. v. Public Service Commission of Missouri, 248 U. S. 61, 70, the court said:
“ On the facts we can have no doubt that the application for a certificate and the acceptance of it were made under duress. The certificate was a commercial necessity for the issue of the bonds. The statutes, if applicable, purported to invalidate the bonds and threatened grave penalties if the *92 certificate was not obtained. The company officials were not bound to take the risk of these threats being verified. Of course, it was for the interest of the company to get the certificate. It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called.”
It is, we think, in view of the authorities, one thing to exact as a matter of right a document conclusive of a proceeding, when the transaction is bona fides and the consequences of the same fall with equal weight upon the parties, and quite another to make available a legal or alleged contractual right which places the burden and assumed risks upon one party if the latter declines to accede to the demands of the other who insists upon the right to exact such terms and is in no position to suffer ill effects from the transaction. The parties are obviously not upon equal terms and the courts adjudicate the transaction with this status always in view. The plaintiff, free from any charge of bad faith, laches, or other cause which might in the remotest degree discredit it, is brought by the department’s delays and neglect to a crucial point in its existence. For a long period of time it has received no payments for its work, and then when immediate necessities threaten, it is confronted with a proposition to either accept what is acknowledged as due and release what is claimed, or assume the risk of vexatious and tedious litigation fraught with expense and trouble to recover a debt, the greater portion of which it is entitled to have paid at once without qualifications or restrictions. Plaintiff had repeatedly urged the Secretary to decide on the items suspended by the cost inspector, but no decision was ever made thereon. We think the Secretary of the Navy could not arbitrarily refuse to consider and decide the items in controversy and then, when the contract had been canceled, refuse through the solicitor of the department to pay plaintiff the amount about which there was not, and had never been, any controversy unless the plaintiff would surrender all rights that it might have to a proper and fair consideration of the disputed items. *93 The contract provided that the Navy Department should pay for the work done within thirty days. The defendant did not comply with this provision and it was only because of this, which resulted in the plaintiff being faced with financial disaster and irreparable loss, that the defendant was able by its failure to fulfill its agreement to exact from the plaintiff an unconscionable release of all claims regardless of their merit. But for the failure of the defendant to fulfill its definite and clear promises under the contract, plaintiff could very well have refused to sign the release. In cases of this kind the defendant should not be permitted to take advantage of its own failure to perform a solemn contract obligation in order to exact from the other parties to the contract a surrender of rights which he would not otherwise be compelled to give up.
This court, in the case of E. W. Bliss Co. v. United States, 61 C. Cls. 777, gave effect to the unqualified terms of several releases and the Supreme Court (275 U. S. 509) reversed the judgment. The order of remand enabled the plaintiff to recover a most substantial sum, despite the conclusive terms of certain releases relied upon, by establishing the pendency of certain additional claims for compensation other than those included in the settlements made and covered by the releases signed.
Settlements and payments exacted by officials of the Government without lawful authority and in arbitrary fashion, to which parties have yielded sometimes under and sometimes without protest to escape onerous penalties and financial disaster, have been set aside innumerable times'* by the Supreme Court. In the early case of Robertson v. Frank Brothers Co., 132 U. S. 17, 23, the Supreme Court in the following language adverted to the principle of duress present in the exaction of illegal custom duties paid to escape penalties:
“ When such duress is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not to be regarded as voluntary. But the circumstances of the case are always to be taken into consideration. *94 When the duress has been exerted by one clothed with oficial authority, or exercising a public employment, less evidence of compulsion or presence is required, — as where an officer exacts illegal fees, or a common carrier excessive charges. But the principle is applicable in dll cases according to the nature and exigency of each.” (Italics ours.)
The same principle was involved in Swift Company v. United States, 111 U. S. 22.
The contract requirement that “ final payments shall be made for work done on each vessel in due course after such work is finished and on the execution of a final release to the department, in such form and containing such provisions as shall be approved by the Secretary of the Navy, of all claims against the United States arising under or by virtue of this contract ” is by its terms limited to final payments. The provisions of the contract with meticulous care set out the basis upon which payments should be calculated and the times when they should be made, and the clause set forth above unmistakably stipulated that a release in the form provided should be exacted for final payments made when the work was completed on each vessel. It was not intended to and did not contemplate a general release comprehending all the work, irrespective of single units completed by the contractor. In other words, when the work on a vessel was finished final payments were to be made, a release executed, and that single transaction closed. That this was clearly the intent of the contract respecting releases is evident from the character of the work to be performed by the contractor. Vessels were to be sent to the plaintiff’s yards from time to time. Neither party knew how many vessels would be sent nor when they would be sent. There was no time limit fixed for sending vessels. The contractor was to be in readiness to perform the work “ whenever required ” and repair and alter “ all such vessels as the department may in case of exigency as aforesaid designate.” Therefore, it is patent, beyond doubt, that payments were to be made and final settlements effected upon the basis of vessels, and not general accumulations of overdue items arising out of the work performed as a whole. The record supplies the fact that the department did not observe this provision of the contract. *95 Nowhere is it possible to find in the record that the sum mentioned in the final release bears relation to wort completed on a single vessel or vessels. No statement or detailed allowance or disallowance of claims is furnished the plaintiff. No information is furnished the plaintiff except the unqualified statement that “ the sum of $850,427.10 due you in final settlement under contract #240 ” will be paid. This, we think, was a distinct departure from contractual obligations upon the part of the department and such a flagrant disregard of plaintiff’s rights under the contract as to challenge its good faith. Surely neither party intended when the contract was entered into that its provisions as to payments were so decidedly unilateral that the department could without notice and without consideration ignore the plaintiff’s contractual rights with reference thereto, and conclude the same by exacting a general release of all claims contrary to the terms of the contract itself. It was the department’s duty under the contract to make final payments for work performed when the work was completed on each vessel des-' ignated and take a release as to that vessel, and if the department had exhibited the same degree of zeal in making settlements, as the contract required, as it did exhibit in procuring the final release involved, this plaintiff would not have been brought to the brink of bankruptcy and compelled by a chain of circumstances, not of its own making, to do what it did.
We have not discussed the rule that where the facts disclose a certain sum to be due another a release of the entire sum claimed upon the payment of part is without consideration and the creditor may sue and recover the residue. We need not cite authorities to sustain it.
One provision of the contract covered the rate to be paid for use of the plaintiff’s dry dock or marine railway when such use became necessary. It is as follows:
“ If any item of work required by the department necessitates the use of contractor’s dry clock or marine railway, the department will pay for the same the prevailing rates.”
On the date the contract was executed the prevailing rates for dry-docking in the port of New York were twelve cents *96 (12^) per gross ton for hauling and ten cents (10(4) per gross ton for lay days, hauling having reference to placing the vessel on the dry dock, and lay day indicates the time spent on the dock undergoing repairs. In the latter part of April, 1918, the rates for the foregoing service advanced, the record establishing that on and after this date rates of sixteen cents (16(4) and fourteen cents (110), respectively, prevailed in the port of New York. The plaintiff notified the department of this advance and its intention to prefer its bills for this service in accord therewith.
There is no dispute as to the facts. The rate did advance and was in effect in all shipyards in the port of New York and regions adjacent thereto. It was paid by all commercial ships and by the United States Shipping Board Emergency Fleet Corporation. The Secretary of the Navy declined to pay the increased rate. Orders were issued directing the cost inspectors in plaintiff’s yard to ascertain from it the actual cost of operating the docks, and from cost of operation ascertain whether the increase was justified. The actual cost was never ascertained, and the department refused to pay more than the rate prevailing on the date the contract was executed. Plaintiff’s contention is for the payment of the difference, alleging that the term “ prevailing rates ” fixes the rates as those prevailing at the time the actual service was performed. It is clear from the contract terms that the cost of operating the docks is not a factor in fixing the rates. To indulge definition of the word u prevailing ” does not itself solve the controversy. What did the parties intend? If a nonflexible rate was to be fixed, the choice of words to fix it was inept, for no difficulty existed in ascertaining the precise prevailing rate on the date the contract was executed. Under the contract the use of the dry dock was not a constant event; its use was sporadic, as the necessities of the case impelled, and as a usual and ordinary incident of the trade, especially a continuing and indeterminate transaction, it challenges the customary practice to hold that the contractor bound itself to a covenant to accept a rate as fixed, when as a matter of fact the subject matter of rates was subject to the rule of supply and demand. The provision was doubtless worded as it *97 was to render botb tbe contractor and the Government subject to the prevailing rate when the work was performed, so that if the rate declined the Government was to get the benefit, and, if it increased, the contractor obtained a like result. This is in accord with the general rules of parties situated as they were in this case, and no doubt the department would have insisted, as it had a right to do, if a lower rate had obtained, to pay upon that basis. The item $77,-116.77, we think, is allowable.
MACHINE TOOLS
Plaintiff’s contract, i. e., Navy contract #240, expressly set forth a method of ascertaining costs of both labor and materials, overhead expense and profit, for the purpose of making payments. This method was as follows: To direct labor charges there was to be added fifty per centum of the same as overhead expense; to the cost of materials entering into the vessels there was to be added ten per centum of the same as overhead, and to the total sum thus produced ten per centum thereof was to be added for profit. With detailed precision the contract defined direct labor and materials and also enumerated what items of expense should be included in indirect or overhead expense. Among the items scheduled as indirect expense and overhead were “the operation, repairing, and care of machinery and machine tools.” Therefore, under Navy contract #240 the use, repairing, and operation of machine tools were not provided for at any specific rate, but compensation therefor was embraced within the fifty per centum increase added to cost of direct labor as overhead. The Shipping Board Emergency Fleet Corporation adopted as a standard form of repair contract involving cost-plus compensation a different provision with reference only to the use and operation of machine tools. Instead of relegating compensation for their use to the general item of overhead, a schedule of rates, specifically designating the machine tools and the rate of pay allowed therefor per hour, was inserted in the contract. Two items of the-schedule will illustrate what we mean, viz:
“ Boring mill — $1.75 [per hour] including operator.”
*98 The Shipping Board exacted bills and made payments when a boring mill tool, or one specified as above, was used, on a unit basis of $1.75 per hour, holding that the $1.75 per hour rate included payment for use of the machine and the wages of the operator as well. The effect of this ruling and payments made in accord therewith was to exclude the fifty per centum addition to the cost of direct labor, and the payment of a ten per centum profit upon the sum of the two, as provided for in the Navy contract #240.
“ Shears — $1.00 [per hour] without operator.”
Bills were stated, approved, and paid by allowing $1.00 per hour for the machine tool used, plus the wages of the operator, plus fifty per centum of the same to cover overhead, to which was added ten per centum of the total as the contractor’s profit. In this latter respect the Navy contract #240 and the board contract contained pay provisions identical in terms. The divergence in terms affected only the machine tools for which a rate was fixed “ including operator.”
On August 9, 1917, the Secretary of the Navy issued a general order requiring all bills rendered for the alteration and repair of naval vessels to be stated and paid in accord with the pay provisions of the standard form of repair contract of the United States Shipping Board Emergency Fleet Corporation, the form of Shipping Board contract commented on above. The above general order was communicated to the plaintiff December 7,1917, and compliance with the same exacted by the cost inspectors of the department in plaintiff’s plant. The plaintiff on November 20, 1917, had entered into a standard form contract with the Shipping Board to alter and repair vessels for the same, and a contention is now advanced that inasmuch as the plaintiff contracted with the Shipping Board under a standard form contract the general order of the Secretary modified the terms of plaintiff’s Navy contract #240 with respect to the pay provisions thereof to conform to the pay provisions of the standard form contract of the Shipping Board. In other words, it is claimed the plaintiff consented to such a modification by preparing and rendering its bills as specified in the general *99 order. On the date in December, 1917, when the Secretary’s general order was communicated to it, the plaintiff had not stated any bills to the Navy Department for work done, and it was discovered by the plaintiff that the prevailing rate of wages paid to machine-tool operators, i. e., fifty-five cents per hour, when compared with the rates fixed in the board’s contract for “ machine tools — including operator,” left to the plaintiff substantially the same margin of profit provided for in its Navy contract #240, and nothing was to be gained or lost by complying with the Secretary’s order, and, so long as this condition obtained, the plaintiff offered no objections and prepared its bills accordingly.
In April, 1918, the United States Shipbuilding Labor Wage Adjustment Board, known and hereafter referred to as the Macey Board, increased the wages of machine-tool operators to seventy-two cents per hour, and thereafter in October, 1918, again increased the same to eighty cents per hour. The plaintiff was compelled to adopt and pay the wages fixed by the Macey Board. The Shipping Board, however, did not increase the rates prescribed in its standard form contract in accord with the Macey Board’s order. Machine tools are of course not in any event available for service without an operator, irrespective of rates or schedules, and the effect of the Macey Board’s increase in wages was to deprive this plaintiff of the profit and benefits of the pay provisions of its Navy contract #240 which had in all substantial respects accrued to it previous to this time. The Macey Board’s wage schedule brought about an emphatic change in contractual relationship. The same conditions did not obtain as had obtained when the Secretary issued his order. Neither the Secretary nor the Shipping Board possessed lawful authority to alter, modify, or increase plaintiff’s contractual burdens and obligations without incurring a corresponding liability to reimburse it (Bliss Co. v. United States, 275 U. S. 509), and yet this is precisely what the Navy Department did. Subsequent to the Macey Board’s ruling and the enforced payment of the increased wages to machine-tool operators generally, the department declined to allow, approve, or reimburse the plaintiff for any *100 increase of wages paid by it in any instance where a machine tool was used, and under the unit schedule rate of the Shipping Board contract the rate specified the machine tool, “ including operator.” It was held by the department that the increase in wages paid to machine-tool operators under the unit schedule of rates, where the use of machine tools was specified as not including an operator, was of sufficient proportion to absorb and recompense the plaintiff for any increase imposed upon it by the Macey Board’s rate of wages in the other respect.
It is not denied that the use of machine tools by an operator brings the service within the contractual classification of direct labor, and that under Navy contract #240 the plaintiff is entitled to be paid in accord with its pay provisions, unless the court may hold that the general order of the Secretary of the Navy had the legal effect of abrogating the pay provisions of plaintiff’s Navy contract #240 and substituting in part therefor the pay provisions of the board’s contracts, which it is claimed preclude a recovery for this item. It is first to be observed that the Secretary’s general order for the rendering of bills antedated the plaintiff’s contract with the Shipping Board by several months, and the terms of the order leave open a serious doubt that it was intended to accomplish more than a uniform administrative method of stating claims without altering express provisions of contracts. Surely the department knew it could not by general orders alter, modify, or change the provisions of lawful contracts. No contention is advanced that the court is powerless to award judgment for increased wages imposed upon the contractor by the findings of the Macey Board. Electric Boat Co. v. United States, 66 C. Cls. 333. What the plaintiff seeks under this item of claim is a judgment for the difference between the fifty-five cent per hour wage it was paying machine-tool operators at the time and prior to the enforced increase in their wages and the advanced wages it paid, computed under the provisions of its Navy contract #240. To this we think it is unquestionably entitled. Navy contract #240 recognized the payment of overhead as a just item of cost of performance. With *101 respect to machine tools, their maintenance and upkeep were included in the established fifty per centum of the wages of direct labor. The operators who operated the machine tools were all paid the increased wage scale. It was concededly direct labor, and we can not assert a lawful reason for denying reimbursement for the increase, and pay according to the contract on the supposed theory that the increase as to one class compensated for the loss as to the other. If the increased wages imposed additional expense in the operation of a machine tool for which a rate was fixed, including an operator, it is apparent that such an increase imposed an obligation and burden upon the contractor by Government order, which the contract did not in terms do, and brought about a changed situation such as the law does not penalize the plaintiff for accepting and acting in accord therewith. The amount, $24,525.45, is not in dispute. Judgment for this sum will be included in the final judgment of the court.
RETROACTIVE WAGES
The Macey Board’s wage scale granting substantial increases in wages to be paid by Government contractors was retroactive in terms. The plaintiff in observing it was compelled to put the increases in effect from March 15, 1918, to April 15, 1918, and the additional increase from October 1, 1918, to October 22, 1918. The Navy Department declined to reimburse the plaintiff for these increases under the pay provisions of Navy contract #240. The most allowed the plaintiff by the department was under its construction of the general order of the Secretary of the Navy of August 7, 1917. The amount due, $31,998.41, is not in, dispute. If we are correct as to our holding, with respect to machine tools, this item of claim is clearly allowable and will be included in the judgment.
SUBCONTRACTORS’ BILLS
The plaintiff contracted with certain subcontractors to do specific work and supply certain materials essential to the completion and repair of certain naval vessels. Plaintiff’s bills, i. e., the ones involved in this item of the claim, were *102 presented under the pay provisions of Navy contract #210. The Navy Department disallowed and declined to pay the percentage of overhead expense which the pay provisions of both the Navy contract #240 and the Shipping Board contract provided. The department, with respect to overhead allowances in which subcontractors were concerned, adopted the following rules of settlement:
When a subcontractor was performing work on Navy vessels under said contract- No. 240, and the contractor incurred overhead thereon, the contractor was allowed and paid the overhead provided for in the contract in the total amount of the subcontractors’ bills. When the contractor did not incur overhead, but simply furnished material, overhead was not allowed, but the contractor was allowed, and paid, the 10% profit provided for in said contract.
Overhead on bills where the contractor incurred no overhead was not allowed nor paid the contractor, for the reason that such charges were classified as material charges in accordance with a ruling of the Secretary of the Navy, which was as follows:
“ (a) Contractors are entitled to 10 per cent overhead on all vouchers submitted by them covering payments for straight purchases of material.
“ (b) Where a subcontractor bills the contractor for services performed, the contractor’s expenditures for payment of such bills will be reimbursed under the heading of material but no overhead charge by the contractor will be allowed unless it is specifically shown that overhead expense has been incurred in connection with the use of the contractor’s facilities and that the contractor has not been reimbursed by the subcontractor for the use of such facilities. All overhead and material expended by the subcontractor in connection with such services will be included in the same bill, together with the subcontractor’s profit. The class of subcontractor’s bills for which the contractor is not entitled to overhead comprises, in other words, those cases where a subcontractor puts men into the contractor’s plant or on board the vessel, and practically takes over a part of the contract and in connection with which the contractor incurs no overhead expense. Where the subcontractor, on the other hand, fabricates material in his own shops and delivers same to the contractor for the latter to install, the case falls under the preceding paragraph and the transac *103 tion is a straight purchase of material by the contractor, on which he is entitled by the terms of the contract to an overhead charge.”
In both the Navy and Shipping Board contracts express provisions identical in terms fixed an allowance of fifty per centum of direct labor charges for overhead, and both contracts fixed an allowance of ten per centum of direct material charges for overhead. Clearly these two provisions were the result of mutual estimation of the cost of overhead and were intended as a general charge against the department without exception and exclusive of computation of actual overhead in the use of labor and the supplying of material. Direct labor as distinguished from overhead comprehended “ only such labor as is expended directly in the work on the vessel and in the contractor’s plant in the production of the elements of the vessel and its outfit.” Direct material “shall include only such materials as are incorporated permanently into the vessel, and scrap from same.”
There is no difficulty in applying pay provisions of contracts so decisively free from ambiguity or doubt as appears herein. If a subcontractor puts laborers to work on the vessels and they performed direct labor for the contractor, and the right to do as was done is not challenged, it must, we think, be conceded that the cost of such .direct labor is under the contract to be paid for in precisely the same manner as if the contractor had supplied it, and a like result followed from the furnishing of direct materials. Such a ruling does not add to or subtract from the contract rights of either party to the same and does not convert an actual labor charge into an assimilated material charge. The fixed rate of overhead contemplates its existence in every instance where direct labor and direct materials are involved, and unless the contract terms may be altered by rulings imposing proof of the existence of actual overhead, the plaintiff is entitled to recover for this item. No contention is advanced that the contractor was not entitled to payment for what the subcontractor did, nor that the subcontracts involved were in any way tinctured with unfairness or prescribed exorbitant rates. As a matter of fact, subcontractors were not *104 utilized except in the performance of such classes of work as the plaintiff organization was not especially competent to perform, and proof abounds that actual overhead expense did obtain. The amount disallowed as overhead expense, and for which judgment is sought, is not in dispute. Judgment for this item, $26,441.18, will be included in the final judgment of the court.
SNAPPERS
The largest single item of claim in the case is embraced within a disallowance of overhead upon what the plaintiff insists is direct labor within the meaning of Navy contract #240. A “ snapper ” was one whose duty it was to direct and expedite the work of a certain group of workmen. He was supposed to keep in close contact with the group of men over whom he had jurisdiction and “ snap ” them out of dilatoriness and see that the given task was accomplished within a proper time. The snapper was in turn responsible to the foreman or assistant foreman in charge of the job. He was a laborer like all the others.
On October 1, 1918, the Shipbuilding Labor Adjustment Board defined and classified laborers and the work they were doing, and by this classification it was determined that not to exceed “ on the average one to evei'j twelve in the craft should be allowed as a snapper or leading man.” In shipbuilding yards where new ships were under construction under cost-plus contracts and the Government was paying cost-plus on the entire costs of the vessels, whether the labor was direct or indirect, the wages of leading men, snappers, and foremen were not included in the fifty per centum overhead charge provided for in Navy contract #240. Therefore, when the cost clerk in plaintiff’s yard audited a charge for direct labor he deducted from the total of men employed one out of every twelve, on the theory that so many snappers should have been or were employed by the plaintiff, and credited his wages to overhead, thereby decreasing plaintiff’s overhead charge on direct labor to the amount of $60,909.05. The classification and definition given to leading men, snappers, and foremen by the wage board are not inharmonious *105 with the terms and intention of the provisions of Navy contract #240 wherein overhead expense is defined. The wage board’s order does not assert a claim to an allowance of one mechanic out of every twelve as a snapper; it simply fixes a prohibitive number — i. e., if more than one indirect laborer is assigned to a group of twelve men, only one may be noticed under the order. The order does not have the effect of dispensing with positive proof as to the number of snappers actually employed on the work. The plaintiff produces a record wherefrom it is shown that a detailed method of accounting for direct labor was set up, a method affording the Government inspectors on the work full opportunity for verifying and checking as to the accuracy of the same, and no complaint or objection was lodged against it by anyone for some time after it was adopted and it was not until quite some time later that the process of deducting for snappers was inaugurated. The defendant’s only witness gives testimony of the course pursued by the cost inspectors in approving or disapproving plaintiff’s pay roll, and from this testimony we are asked to find that all nonworking snappers were classified and paid as indirect labor, and working snappers paid as direct labor. This may all be true, but it does not solve the question. Plaintiff is not asserting a claim for nonworking snappers. Its contention is that direct labor was wrongfully counted as indirect labor, and that .mechanics doing direct labor were without cause designated nonworking snappers. The defendant produces no more than a general statement that the course the Navy Department pursued as to this item of claims was a correct course and that the deductions of overhead made were justified. The plaintiff meets the issue by proof that each man who went aboard the vessels for direct work bore on the lapel of his coat a certain number and that a Government inspector stood on the gangplank and counted each man and thereby verified the number; that superintendents, foremen, and indirect laborers were not numbered, were paid on a weekly or monthly wage basis, and never included as direct labor on the plaintiff’s pay roll. Surely it was incumbent upon the defendant, in the face of such proof, to establish *106 as a fact that the great number of laborers designated as snappers by the department were in fact snappers. The sources of information were available to the defendant as well as the plaintiff, and we can not do otherwise than sustain the plaintiff’s contention, for the sum involved is not in dispute and there is no positive evidence which challenges the verity of plaintiff’s system and method of accounting for actual numbers of direct labor. It is impossible to adjudicate contractual rights involving an issue of fact adversely to a contractor whose proof establishes conformity to a system of ascertaining accurately the number of men employed in direct labor and which is in no way challenged except by a general statement or fragmentary instance of accuracy, lacking definiteness and in no way disclosing a positive right to do what was done by the department-.
ADDITIONAL GUARDS FURNISHED
The contract imposed an obligation on the plaintiff to provide sufficient watchmen or guards to protect the Government vessels in its possession. This the plaintiff did to the satisfaction of the department. In November, 19TT, the Navy Department became alarmed over the possibility of espionage and acts of violence from enemy aliens and issued a general order to all naval contractors engaged in war production to provide, in addition to the guards exacted under contracts, such a force of guards as the department might require. An addendum to the contract was mailed to plaintiff as shown in Finding XVI, and the plaintiff under orders of the Navy Department provided the additional guards, all of whom remained at the plant on duty until they were finally relieved by a detachment of military force detailed by the Government to supplant them.
The plaintiff paid the wages of these guards and seeks herein to recover not only the sum paid as wages but overhead and profit. The contention is based upon the pay provisions of the contract. There are no provisions in the letter transmitting the addendum to the contractor or in the addendum itself for paying the extra guards in the event of their installation. The guard service provided for in *107 the contract was, we think, overhead, i. e., it does not fall within the contract’s definition of direct labor. The plaintiff contends that it is extra work authorized under the contract. It was in fact an inserted provision in the contract, mutually assented to by both parties. It did, of course, impose additional obligations, and the plaintiff is entitled to reimbursement for the expense incurred. The only issue is as to whether profits are to accrue to the plaintiff or whether reimbursement is the measure of damages. We think the latter is alone sustainable. The service rendered by the guards, while not'specifically defined in the clause delineating allowable overhead expenses, is so closely akin to wages paid timekeepers, inspectors, etc., that it apparently falls within that classification. The contractor was content to supply such “ adequate and efficient watch ” as the Secretary might require, and this was agreed to without stipulating the service as direct labor. Therefore what was done in exacting additional guards was the augmentation of the force way beyond- the limits of what either party contemplated as being within the contract provision upon the subject, and for an especial and critical emergency, an expense the department deemed it immediately necessary to incur and for which it expected to pay.
The defendant does not challenge the right to recover, and we think the wages paid for this additional service are alone recoverable, to wit, $14,178.40. The service, while extra in its character, was in its essence an overhead expense, which, save for its imposition by way of an addendum to the contract in manner as set forth above, the contractor would have had to pay.
OVERTIME WAGES EOR NIGHT DRT-DOCKING
The Navy Department required the dry-docking of certain vessels at night. The plaintiff was to be paid the prevailing rate for dry-docking, a subject heretofore discussed. In order to comply with the required service the plaintiff was compelled to pay its employees engaged therein overtime wages for night work. It is not disputed by the defendant that it cost the plaintiff $2,480.25 more in wages *108 for dry-docking vessels at night than it would have cost if the same had been done in the usual daylight working hours. The prevailing rate for dry-docking was based on the usual and customary service involved in a task of this character, and not upon an unusual and exceptional service exacted in an emergency and of benefit to the party exacting it. Under the contract the wages of employees engaged in dry-docking fall within the rate to be paid for the service. In other words, the amount paid as wages to laborers is included in overhead, but this item for reimbursement for extra overtime wages, if allowed, serves only to secure to the contractor the pay it was entitled to receive under the contract for dry-docking vessels- as contemplated by the parties. It was an extra service over and above what the parties intended by the rate to be paid for dry-docking and one which we think the plaintiff is entitled to recover. The additional expense incurred in any event was not in excess 'of the prevailing rate for dry-docking vessels at night.
The plaintiff’s last amendment to its petition sets up a claim for interest upon whatever judgment may be recovered. We assume, notwithstanding the somewhat obscure basis of the claim, that it is predicated upon the theory that a judgment in the case is the equivalent of a judgment for just compensation under the act of June 15, 1911. This war-time legislation (40 Stat. 182) authorized the President to cancel existing or future contracts, and provided, as previously observed, that the President should fix just compensation, and if the amount so fixed was unsatisfactory to the contractor he might accept seventy-five per centum thereof and sue in this court for sucia further sum as added to the seventy-five per centum would make up just compensation. The Supreme Court in the Seaboard Air Line case (261 U. S. 299) decided that interest was allowable, not as interest but as part of just compensation, in cases arising under the act of October 6,1917, and if the judgment in this case were rested upon an allowance of just compensation due the plaintiff because of the cancellation of its contract under the statute authorizing cancellation, the con *109 tention would be invulnerable. Here, however, we have a vastly different and distinct state of facts. While it is true the plaintiff’s contract was canceled under the statute, and just compensation for its value due it, the judgment awarded is for sums long due the plaintiff under the contract prior to cancellation, which the defendant declined to pay, and for which the plaintiff had a cause of action as for a breach of contract, irrespective of the cancellation of the same. The present cause of action is not attxubutable in any particuluar to the cancellation of the contract, and while proof of just compensation would be admissible because of cancellation, it is in the petition and proof predicated exclusively upon the breach of the contract later canceled and was available to the plaintiff at any time within-six years of accrual under section 145 of the Judicial Code. The plaintiff neither gained nor lost its rights by reason of cancellation in so far as the items of loss here involved are concerned, and no proof exists upon which any loss due to cancellation appears. The contract terms obligated the plaintiff to alter and repair such vessels as the defendant designated and delivered to it for alteration or repair. No specific number of vessels obtained and the volume of work and compensation to be received were de-dependent upon what the defendant did in this respect. It was a cost-plus contract and the record fails to establish any loss accruing to the plaintiff by reason of cancellation. The Russell Motor Car Co. case (261 U. S. 514) precludes the allowance of profits, and in the opinion it is said by the court (pp. 523-524) :
“It is contended, further, that even if the action of the Secretary of the Navy was warranted by the statute the car company was nevertheless entitled to have included as just compensation its anticipated profits.
“ This contention confuses the measure of damages for breach of contract with the rule of just compensation for the lawful taking of property by the power of eminent domain. In fixing just compensation the court must consider the value of the contract at the time of its cancellation, not what it would have produced by way of profits for the car company if it had been fully performed. It is evident that no prudent person, desiring to acquire this contract, would *110 have paid for it the full amount which could be realized upon completion, leaving no chance of return to himself upon the investment or for the risk and labor incident to its performance. The contract, we must assume, was entered into with the prospect of its cancellation in view, since the statute was binding and must be read into the contract. The possible loss of profits, therefore, must be regarded as within the contemplation of the parties. The lower court was right in refusing to allow anticipated profits and, there being nothing in the findings to justify the contrary, we must accept the amount fixed on the basis of just compensation as adequate.”
In our opinion, the allowance of interest herein would confuse “ the measure of damages for breach of contract with the rule of just compensation for the lawful taking of property by the power of eminent domain.”
We have no proof of unworked and unused materials allocated to the contract work, nor the outlay of any sums other than those due and unpaid by the terms of the contract. In so far as the court is advised, the plaintiff will be made whole when it receives the damages claimed for a breach of the contract. The suit is upon the canceled contract and not upon the statute and the judgment follows from a failure upon the part of the defendant to observe the contract. Reference to cancellation has to do with the right to exact the final release under a canceled contract. We resort to the canceled contract as evidentiary of what was due thereunder.
The plaintiff is entitled to a judgment in the sum of $231,649.51, made up of the following items: Dry-doclring, $71,116.17; machine tools, $24,525.45; retroactive wages, $31,998.41; subcontractors’ bills, $26,441.18; extra guards, $14,178.40; foremen and snappers, $60,909.05, and overtime night dry-docking, $2,480.25. It is so ordered.
Whaley, Judge, and LittletoN, Judge, concur.