**AIRCRAFT ASSOCIATES & MFG.
CO., Inc.**
v.
**The UNITED STATES.**
**No. 403–62.**

United States Court of Claims.
March 18, 1966.

Charles A. Hobbs, Washington, D. C., for plaintiff. Robert W. Barker, Washington, D. C., attorney of record. Wilkinson, Cragun & Barker and Claron C. Spencer, Washington, D. C., of counsel.

Isaac D. Benkin, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. James F. Merow, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

On July 22, 1957, plaintiff contracted to purchase from the Government 306 surplus aircraft carcasses (mostly B–29 and B–50 types) at a bid price of $1,532,-601.94. The surplus aircraft were located at Davis-Monthan Air Force Base in Tucson, Arizona, and payment was to be made to the Government within 10 days of the date of the contracting officer's invoices for aircraft delivered to the contractor. Under the terms of the contract, the purchaser had the right to remove intact certain parts and items of equipment for resale. The remainder of the aircraft was to be demilitarized by cutting them apart and putting them through a reduction furnace to sweat or melt off the aluminum content. All scrapping of the airplanes was to take place under the watchful eyes of the Government on the base, where the contractor was required to furnish and install at his expense a furnace for melting ingots the aluminum contained in the aircraft.

In preparing its bid, plaintiff calculated its expected profit on its estimate of the material it could recover and sell. The principal item was the aluminum which was to be cast into ingots and sold on the market. Plaintiff also expected to realize a profit on the resale of engines, propellers, seats, and other usable parts, plus various items of scrap. The hoped for gain did not materialize for several reasons. Among these was a drop in the aluminum market and two factors which considerably reduced the quantity of material recoverable from the carcasses. The first factor was a miscalculation by plaintiff of the total weight of the 306 airplanes, plus a highly optimistic guess as to the amount of aluminum that could be obtained from the carcasses. The second factor was the removal by personnel of defendant of a substantial number of parts from the aircraft between the time the invitation for bids was issued and before title passed to plaintiff. Claims for shortages in gross weight and in aluminum content and for the missing parts were filed with the contracting officer and, upon his denial thereof, an appeal was taken to the Armed Services Board of Contract Appeals. After a full hearing, the Board by decision rendered June 29, 1961, denied plaintiff's claim in all respects, except a claim for parts removed after September 16, 1958, the date of Supplemental Agreement No. 2 entered into between the parties. Thereafter, the Board accepted a stipulation of the parties that plaintiff was entitled to a credit of $4,449.50 for the fair market value of those parts.

In Count One of its petition in this court, plaintiff seeks a recovery of approximately $225,000 for the shortages in the weights of the carcasses delivered. In Count Three of the petition, plaintiff claims $565,000 for the value of the parts removed by defendant's representative.[1]

1. Count Two of the petition in which plaintiff alleged that the defendant had misrepresented the quantity of aluminum that could be extracted from the carcasses has been abandoned.

With respect to plaintiff's claim as to the shortage in the gross weights of the aircraft, the ASBCA held that plaintiff had assumed the risks inherent in an "as-is-where-is" contract, the provisions of which expressly disclaimed any guaranty, warranty, or representation as to the weight of the property. The Board also decided that plaintiff could not recover on the parts removal claim, because it had released that claim in the Supplemental Agreement No. 2 of September 16, 1958. The Board held that the release was not executed by plaintiff under economic duress and that the release was a complete defense to the claim.

In its motion for summary judgment defendant asserts that all the material facts are contained in the record and decision of the ASBCA and that the Disclaimer of Warranties clause in the contract and the release signed by plaintiff defeat its right to recovery. Defendant has also interposed a counterclaim for the unpaid balance due on the contract. Plaintiff agrees that the facts relating to its claim for deficiencies in the weight of aircraft purchased are not in dispute and that the claim may be decided on the pending motion. With respect to its claim for the missing parts, however, plaintiff contends that if the facts contained in the administrative record are not sufficient to invalidate the release executed by plaintiff, it is entitled to a trial de novo on that issue, which is said to be decisive of defendant's liability on the missing parts claim.

■ After studying the ASBCA decision, we note that the Board made very few findings of fact as such. Aside from its decision on the legal questions presented, the Board's opinion consists for the most part of a recital of much, but not all, of the material evidence offered by both parties. However, we have available to us not only the decision but the complete record of the hearing before the Board. Consequently, we agree with defendant that there is no occasion to resort to extraneous evidence for the resolution of the issues relating to plaintiff's right to recover and to plaintiff's liability on defendant's counterclaim. P.L.S. Coat & Suit Corp. v. United States, 180 F.Supp. 400, 148 Ct.Cl. 296 (1960).

Claim for Shortage of Gross Weights— Count One of the Petition

■ The aircraft carcasses were offered for sale "as-is-and-where-is" and were to be bid on a "per each" basis and not by the pound. The invitation for bids listed them as follows:

"2. AIRCRAFT CARCASSES, residue of reclaimed B–50 aircraft without engines. Estimated total Gross Weight approximately 40,000 pounds each. A number of main landing wheels and other components removed * * *.

"3. AIRCRAFT CARCASSES, residue of reclaimed B–29 Cocooned aircraft with engines. Estimated total Gross as-is Weight 65,000 pounds each * * *.

"4. AIRCRAFT CARCASSES, residue of reclaimed B–29 aircraft, non-cocooned, with total of 39 each engines, nose wheels removed and 10 missing, also a number of main landing wheels and other components removed. Estimated Total Gross, as-is Weight 62,000 pounds each * * *.

"5. AIRCRAFT CARCASSES, residue of reclaimed B–29 aircraft, Non-Cocooned with engines and propellers with the following exceptions: 1 each engine, 30 each propellers, spark plugs, antennas and other minor components, have been removed from this item of aircraft carcasses. The nose landing wheels will be removed upon delivery to the contractor. Estimate total gross as-is weight 63,000 lbs. each * *."

The listed estimated weights were arrived at by personnel at the San Bernardino Air Materiel Area, Norton Air

Force Base, California, who used weight and balance data contained in documents received from the Davis-Monthan Air Force Base. Plaintiff's manager visited Davis-Monthan Air Force Base in March 1957, where he inspected a half dozen airplanes that were open. He made a further inspection on April 5, 1957. According to figures which plaintiff submitted to the ASBCA and now claimed in Count One of the petition, about 12 percent less gross weight was received than the estimated amounts. The ASBCA found there was nothing to show that the estimated weights contained in the invitation for bids were arbitrarily arrived at or that they were unreasonable. The finding is supported by substantial evidence. Moreover, the following provision of the contract put plaintiff on notice that it assumed the risk that the estimated weights would be less than the actual weights and that no representation or warranty of any kind was given as to the weight of the surplus property:

"CONDITION OF PROPERTY.— All property listed herein is offered for sale 'as is' and 'where is,' and without recourse against the Government * *. The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to * * * weight * * * of any of the property * * * and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample."

Under the uncontroverted facts before us, the law is settled that the above-quoted provision must be given effect and that it precludes plaintiff's recovery on the weight shortage claim. We need do no more than repeat our previous holding that this standard provision in Government disposal contracts is neither unduly broad nor oppressive. The policy that dictated the reasons for placing such risks upon the purchaser of surplus property sold by the Government has been considered and examined in many cases.

See Rochester Iron and Metal Co. v. United States, 339 F.2d 640, 168 Ct. Cl. 422 (1964), and cases cited therein. We concur in the ASBCA decision that there is no merit to the claim asserted in Count One of plaintiff's petition and it is therefore dismissed, as is Count Two, which plaintiff has abandoned.

### Missing Parts Claim—Count Three of the Petition

Although the evidence in the administrative record is not sufficient to provide a complete description of the parts removed or the value thereof, it is conceded that defendant removed a large number of parts from the aircraft between the time the invitation for bids was issued and the dates on which title passed to plaintiff. The ASBCA held that "under these circumstances it is considered that appellant would have been entitled to an adjustment in the absence of a release of his claims." Defendant's sole defense to its liability to plaintiff for the value of the missing parts is the release contained in Supplemental Agreement No. 2. Although the Board concluded that the release was not executed under circumstances of economic duress, that was a decision upon a question of law and is not entitled to finality under the provisions of the Wunderlich Act, 68 Stat. 81.

In order to determine the validity of the release, it is necessary to consider in some detail the factual background preceding the signing of the release and the setting in which that document was executed.

About the middle of the year 1958, plaintiff's financial condition became very precarious as a result of a sharp drop in the price of aluminum, the unexpectedly low yield of aluminum from the carcasses, the reduced recovery from the sale of parts because of many missing parts, and other factors. Unpaid invoices had accumulated in an amount which exceeded $600,000. Plaintiff sought credit for the parts removed on the basis of a claimed valuation of $500,000 but the credit was denied. In an

attempt to obtain relief in price, even if it meant that plaintiff would realize little or no profit, plaintiff tried to effect a supplemental agreement which might have accomplished this objective. However, the agreement was rejected on the ground that the consideration flowing to the Government was too limited.

In the early part of August 1958, a successor contracting officer entered the picture, and on August 15 following, he notified plaintiff that it had breached the contract by failing to pay the amount delinquent and to meet specified delivery schedules. He further stated that the Government proposed to terminate the contract and resell the aircraft. Plaintiff was given 30 days in which to appeal. At that time about one-half of the aircraft purchased under the contract had been sweated and work had come to a standstill.

Plaintiff's manager began to scramble around in an effort to obtain some kind of an agreement that would permit plaintiff to continue with the contract and hopefully recoup its costs. After submitting a second request for price relief, plaintiff met with officers in the Procurement Policy Division at Air Force Headquarters to discuss the problem but was advised that he should pursue the matter with the contracting officer. On August 27, 1958 and before the expiration of plaintiff's time for appeal from the contracting officer's decision of August 15, 1958, defendant notified plaintiff by letter that since the contract had been terminated, plaintiff must immediately vacate the premises, that passes of its employees would be rescinded, and that a guard would be placed around the reclamation area. By this action, plaintiff was effectively barred from the base and from access to a large inventory of salable property which it had stripped, processed, and sweated down from the aircraft. Since the inventory represented the only means by which plaintiff could obtain funds to pay its contractual obligations, plaintiff feared that it faced economic disaster if the inventory should be sold by defendant under the Termination for Default clause of the contract.

On September 5, 1958, plaintiff appealed from the August 15 notification and continued to press its demand for payment of the parts removed. On September 11, 1958, the contracting officer sent plaintiff's counsel a proposed supplemental agreement which contained substantially the same provisions as Supplemental Agreement No. 2, the document in controversy here. A meeting was held on September 15, 1958, among the contracting officer, plaintiff's manager, and its counsel. After a long afternoon of discussion, much of which was centered around the removed parts claim, the contracting officer prepared Supplemental Agreement No. 2. At that time, the price of aluminum had risen and both parties were anxious to continue the contract. Although plaintiff asserted that several hundred airplane seats, 57 landing gear assemblies, plus numerous instruments and small parts had been removed by defendant, the contracting officer insisted that plaintiff furnish a complete and detailed list of the removed parts. The evidence shows that records of the parts defendant had removed from the aircraft had been kept by defendant and were then available at the Davis-Monthan Air Force Base, and there is no showing that plaintiff was then aware that such records existed. However, the contracting officer made no effort to obtain these Government records and did not refer to them in the discussion.

Since the contracting officer had adopted a belligerent attitude toward plaintiff's manager, most of the statements in behalf of plaintiff were made by its counsel. He maintained that it was unfair to require a release of the parts claim as a condition precedent to resumption of work on the contract. The contracting officer, however, was adamant that without a release of the claim plaintiff would not be allowed to continue the work. Plaintiff's evidence shows that at the outset of the meeting the contracting officer took the position that no parts had been removed with the excep-

tion of two old pilot seats worth two dollars each. He asked plaintiff's counsel to place a nuisance value on the claim and when counsel responded with a figure of $150,000, the contracting officer offered $15,000 in settlement of the claim. The contracting officer then stated that he was going on a vacation in a day or so and "there would be no deal unless the release of the parts claim was signed." Under these circumstances, plaintiff decided not to accept such a small sum for fear that any further claim for relief would be barred. Since it was apparent that it would be impossible to negotiate a fair settlement of the parts claim, plaintiff's manager decided to accept the supplemental agreement and signed it the following day. The ASBCA concluded that the execution of the release at a zero figure was a calculated risk assumed by plaintiff in the hope that plaintiff would be in a better position to argue for setting the release aside at some future date.

Supplemental Agreement No. 2, which contained the release, provided that:

(a) the contractor would sell its reduction furnace to the Government at the previously-agreed-upon price of $30,000, the price to be deducted from its then-outstanding $674,336.89 indebtedness to the Government;

(b) the contractor would pay its remaining debt of $644,336.89 to the Government in two installments: $400,000 by November 1, 1958 and the balance by December 1, 1958;

(c) the Government would give plaintiff a rent-free lease on the furnace for the duration of the contract;

(d) the contractor would release any and all claims against the Government for missing parts;

(e) the contractor would be permitted to sell the inventory on the premises at Davis-Monthan Air Force Base, with the proceeds going into a jointly-controlled bank account;

(f) the contractor would be permitted to resume demilitarization of aircraft and would accelerate its perform-

ance so as to complete the work by February 15, 1959, and

(g) the contractor would withdraw its appeal from the Contracting Officer's notice of default.

Work on the contract was thereafter resumed and completed on July 31, 1959. Once it was permitted to sell the inventory and resume work, plaintiff was able to meet the payments provided for in the supplemental agreement but, at completion of the contract, it still owed the Government more than $300,000 for aircraft delivered. Approximately $150,000 is now on deposit in the joint bank account. On October 22, 1959, plaintiff filed with the contracting officer a third request for relief, which renewed and included the parts claim. The suit in this court followed the denial of plaintiff's claims by the contracting officer and by the ASBCA on appeal.

■■■ Economic duress may not be implied merely from the making of a hard bargain. Fruhauf Southwest Garment Co. v. United States, 126 Ct. Cl. 51, 111 F.Supp. 945 (1953). We recognize that the terms of the contract gave the Government the right to terminate for default in payments, to resell the inventory on hand, and to charge plaintiff the difference between the price obtained and the contract price, less prior payments. Therefore, if the Government's wrongful actions had not caused or contributed to plaintiff's financial difficulties, the exaction of a release from plaintiff under a threat to exercise the Government's contractual right would not vitiate the release on the ground of duress. Commonwealth Engineering Co. of Ohio v. United States, 148 Ct.Cl. 330, 180 F.Supp. 396 (1960), cert. denied, 364 U.S. 820, 81 S.Ct. 55, 5 L.Ed.2d 50 (1960).

However, the facts of this case do not place it within the ambit of the rule laid down in those decisions. Here, the officials of the defendant knew that there had been extensive removals of salable parts from the carcasses. On several occasions, the removals were made with

plaintiff's knowledge and on the assurance of Government officials that plaintiff would be paid for the parts taken. Moreover, there is no question that the Government's wrongful removal of the parts contributed substantially to plaintiff's financial distress. The record shows that after plaintiff regained possession of its inventory and resumed work on the contract, plaintiff's payments, plus subsequent credits, reduced the debt to the Government to the sum of $324,136.90. In addition, there is on deposit in a joint bank account the sum of approximately $150,000 realized from sales made by plaintiff. While we do not have sufficient evidence before us to, determine the value of the parts removed, the lowest figure plaintiff proffered as to the value of those parts was the $150,000 nuisance value figure communicated to the contracting officer at the conference of September 15, 1958. It is apparent, therefore, that if plaintiff had been credited with as much as $150,000 on the parts claim, that sum, together with other payments and credits, would have satisfied almost all of its debt to the defendant.

Both the Board in its decision and the Government in its brief here place much reliance on the testimony of the contracting officer before the Board that, "I could not protect the interest of the Government and turn over to the contractor the airplanes which were the subject of the dispute." We agree that the contracting officer had the right and the duty to protect the interests of the Government in the circumstances, but we think that the manner in which he exercised his authority and discharged his duty was arbitrary and unreasonable. He demanded that the parts claim be settled within a matter of one or two days, and the Board found that the contract would not have been reinstated unless plaintiff had released the claim for the parts. Although he may not have known that large quantities of parts had been taken, the contracting officer could readily have ascertained from officials at the Davis-Monthan Air Force Base

that many parts had been removed after the invitation for bids was issued and before plaintiff received any of the airplanes which it contracted to purchase. The evidence before the ASBCA indicates that plaintiff did not then know that records of the parts removed had been kept at Davis-Monthan Air Force Base and were readily available to the contracting officer. Presumably, such records constituted the best evidence of the removals. Without making any effort to obtain such records and without referring to them in any way, the contracting officer insisted that plaintiff furnish a complete and detailed list. Just how the plaintiff could have furnished an accurate and complete list of the removals when many parts were taken before any of the aircraft was delivered to plaintiff is a question which we find unanswered either in the Board's decision or in defendant's brief. The token offer of $15,000 in settlement of plaintiff's claim can hardly be regarded as an effort to effect a fair settlement in view of the unequal bargaining position which the parties occupied and the financial morass into which plaintiff had fallen.

▇ When all of the facts recited above are coupled with the exclusion of plaintiff and its workmen from the base and the deprivation of the only opportunity plaintiff had to repay its obligation to the Government, we conclude that the release was obtained by the kind of duress which renders the release invalid and not binding upon the plaintiff. James Shewan & Sons v. United States, 73 Ct.Cl. 49 (1931) and Struck Construction Company v. United States, 96 Ct.Cl. 186 (1942). As the court stated in the Shewan case 73 Ct.Cl. at page 93:

> In cases of this kind the defendant should not be permitted to take advantage of its own failure to perform a solemn contract obligation in order to exact from the other parties to the contract a surrender of rights which he would not otherwise be compelled to give up.

In that decision the court pointed out that settlements and payments exacted by officials of the Government without lawful authority and in arbitrary fashion to which parties have yielded to escape financial disaster have been set aside on numerous occasions by the Supreme Court. Thus, in Robertson v. Frank Brothers Co., 132 U.S. 17, 23, 10 S.Ct. 5, 6, 33 L.Ed. 236 (1889), the Supreme Court stated:

> When the duress has been exerted by one clothed with official authority, or exercising a public employment, less evidence of compulsion or pressure is required; as where an officer exacts illegal fees, or a common carrier excessive charges. But the principle is applicable in all cases according to the nature and exigency of each.

■ Plaintiff did not file a cross motion for summary judgment, but its counsel at oral argument requested that plaintiff's response to defendant's motion be treated as a cross motion for summary judgment. In order to expedite the disposition of this litigation, we shall grant that request as we have in other instances. Greenway v. United States, 163 Ct.Cl. 72 (1963). On that basis, we hold that plaintiff is entitled to recover on the cause of action alleged in Count Three of its petition for the value of parts removed from the aircraft from the date the invitation for bids was issued to September 16, 1958. Since the ASBCA failed to make any findings on the amount due on the claim, the case is remanded to the trial commissioner for a determination of the amount of the recovery, pursuant to Rule 47(c). Stein Bros. Mfg. Co. v. United States, 162 Ct.Cl. 802, 337 F.2d 861 (1963).

Plaintiff has admitted it has no defense to defendant's counterclaim and that there is due thereon the sum of $324,136.90. Defendant is entitled to judgment in that amount, but the entry of judgment on the counterclaim, plus the question of the allowance of interest thereon, is deferred pending a decision on the amount of plaintiff's recovery.

When the trial commissioner's report on that issue is returned to the court, both parties will be granted an opportunity to submit additional briefs and argument on the interest question.