**William Clyde BURTON**
v.
**The UNITED STATES.**
No. 246-67.

United States Court of Claims.
Dec. 13, 1968.

Davis, Laramore and Durfee, JJ., dissented.

William Clyde Burton, plaintiff, pro se.

James G. Greilsheimer, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant, James F. Merow, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This back pay action is before us on defendant's motion for summary judgment. There is no cross-motion. The alternatives therefore are to allow the motion and dismiss the complaint, or to deny the motion and order trial. We allow the motion and dismiss the complaint. We believe there is no triable issue of fact and under the undisputed facts plaintiff is not entitled to recover. The evidence is documentary, including recorded testimony.

Plaintiff, a Negro, following certification by the Civil Service Commission, was appointed an Engineer, SP 9–175, Level 15, with the Engineering Branch, Engineering and Facilities Division, Regional Office, Post Office Department, Philadelphia, Pennsylvania. The action was effective and he entered on duty August 24, 1964. The Regional Office, headed by a Regional Director, is responsible for a three-state region, interposing between the individual post offices and the Department in Washington. It was concerned, among other things, with construction and leasing of post office premises. In this and other field activities of the Department, employees were not graded and classified by law under the familiar GS system and plaintiff's pay in Level 15 was slightly below that of a GS–14.

The position of Chief Engineer became vacant and plaintiff applied for it. At about the same time there arose a dispute as to the exact scope of plaintiff's duties. On March 2, 1966, plaintiff made a written complaint alleging racial discrimination in that he was not allowed to function at the 15 Level as

his job description called for. On April 18, 1966, he alleged racial discrimination in that he was not appointed Chief Engineer and that another person less qualified than himself had been placed in the job in an acting capacity.

Under EO 11246, EQUAL EMPLOYMENT OPPORTUNITY, and implementing regulations of the Post Office Department, Part 747 of the United States Postal Manual, the Equal Employment Officer of the Department and his Deputies were to evaluate such complaints and act on them, subject to appellate review in the United States Civil Service Commission. After investigation the Equal Employment Officer, on January 4, 1967, advised plaintiff in writing that his complaints were not substantiated by investigation. Plaintiff's duties, he stated, embraced some of those called for in the job description, and were the same as those previously assigned a Caucasian Engineer at the same level. There could have been no discrimination in filling the Chief Engineer position because it had not been filled. The letter advised plaintiff he could appeal to the Commission's Board of Appeals and Review, but this he did not do. Earlier he and his counsel had refused to continue with a formal hearing after the Deputy Equal Employment Officer had ruled he would not enlarge the scope of the inquiry to cover discriminations other than the two above mentioned. It is clear, therefore, that the administrative remedy was not exhausted, these complaints have been finally adjudicated, and they are not before us for review. Nevertheless, they have a kind of life in this proceeding, as will appear.

On May 19, 1966, Mike E. Chapin, Deputy Director of the Office of Regional Administration, Washington, D. C., wrote plaintiff a letter reading in its entirety as follows:

It has been determined that it is in the best interests of the service that you be permanently assigned to the position of General Engineer, grade GS–14, $14,680 per annum, in the Office of Research and Engineering, Washington, D. C. The effective date of the change is June 1.

This reassignment was elsewhere called a "promotion" because of the pay increase involved. It was done entirely at the initiative of Washington. Mr. Doherty, the Regional Director, testified without contradiction that he had never heard of such a plan until he received an information copy of the above letter. The Washington officials testified they had these considerations in mind: 1. The Washington Office of Research and Engineering was being built up; it needed (and had funds for) 50 to 100 engineers, an occupational category in short supply and unavailable locally, and plaintiff was qualified; there was no one qualified who was already in the employ of Washington headquarters. 2. The Washington officials were aware of a "lack of rapport" between plaintiff and his superiors in Philadelphia, so removal of plaintiff from that scene might make for the good of the service there. 3. The plaintiff possibly needed in his own interest a fresh start in a new environment where he could display his talents to better advantage. This testimony was given on oath before the CSC Regional Appeals Examiner, as will appear. Plaintiff, before us acting *pro se*, then had competent counsel, who did not attempt, however, to impeach or refute this testimony. Any suspicion as to good faith that might arise from the brusqueness of the letter, the shortness of the notice, and the pendency of the discrimination appeals, must yield before uncontradicted evidence. Plaintiff in opposing the motion here, does not say he has any new evidence on this matter. Chapin indeed displayed his good faith by phoning plaintiff and urging him to come to Washington to see him and ascertain at first hand what was in store for him in the new job. Plaintiff made an appointment but failed to keep it. If he had kept it, his suspicions might have evaporated, or he might have confirmed them and had

more than mere suspicion to offer to us here. As things are, it is not Chapin's good faith that shows to disadvantage at this juncture.

Things took their destined course. Plaintiff by letters refused to accept the reassignment. He insisted, as he still insists, that his "tenure" as a civil servant entitled him to take root in Philadelphia; that the expense of disposing of his home and moving his family would be ruinous (although the Post Office Department would have picked up the tab for this at least to the extent the law permitted); that the real purpose of the order was just to continue the scheme of racial discrimination. At the instance of a Congressman, the time was extended to June 20. On that date plaintiff was formally terminated at Philadelphia and entered on the rolls at Washington. As he did not show up there, he was carried as AWOL. On June 29 the Departmental Personnel Director sent him a notice that it was proposed to remove him for failure to accept the Washington assignment. On August 5, the removal was effective.

Plaintiff took the customary appeal to the Civil Service Commission and made two more complaints of racial discrimination; one for the transfer order and one for the separation. Regional Appeals Examiner Niles conducted on October 26, 28, and 31, a Hearing at which consideration of these discrimination complaints were consolidated with the appeal from the adverse action. As stated above, Mr. Burton was represented by counsel, though at times he addressed the examiner *pro se*.

In the course of the Hearing Mr. Niles made an important ruling which controlled the subsequent history of the case. Plaintiff's counsel wanted to relitigate all the disputes plaintiff had had with the Regional Office right back to the start of his employment. His theory was that an official guilty of discrimination is unlikely to admit it. You had to prove it by a series of acts, or course of conduct over a period of time; things that taken separately might be meaning-

less, placed together made a picture. The Government counsel was apparently willing to go along with this, on the expectation, no doubt, that the evidence would disclose such an appalling history of insubordination that no tribunal on earth would hold in plaintiff's favor. Mr. Niles, however, said he would not allow plaintiff to introduce evidence so manifestly prejudicial to plaintiff's case. Discrimination in the course of the Philadelphia employment was the subject of another proceeding, not the one before him. He conceded there might be two ways in which this evidence or parts of it might yet come in before him. One was if it should appear the Regional Office had counseled or requested the action to transfer plaintiff. This was foreclosed when uncontradicted evidence showed the action was at headquarters initiative and was as much a surprise to the Regional Director as it was to plaintiff. The second way was the fact the action was based in part on a belief in a "lack of rapport" at the Regional Office between plaintiff and his superiors. He would receive instances of lack of rapport as known to headquarters before they took the action they did. Plaintiff had indeed written directly to headquarters on several occasions, alleging lack of rapport, the substance if not the name, so they possessed partial knowledge. Awareness of other instances could not be imputed to headquarters, and these Mr. Niles excluded.

At the close of the hearing plaintiff's counsel thanked Mr. Niles for conducting it in a fair and impartial manner. From this it may be deduced that he was by this time aware of the chasm Mr. Niles saved him and his client from plunging into.

The CSC Regional Director's decision was that the Agency could and effectively did place plaintiff in the Washington position, even without his consent, and that removal for refusal to report there would be proper if plaintiff persisted in it. However, he thought that the Agency did wrong in reassigning and firing plaintiff while his first two discrimina-

tion complaints were not acted on. Moreover, he thought the Agency should have informed plaintiff sooner than it did that it had selected him in conformity with the published promotion plan. In view of this, he deemed it unnecessary to pass on the complaints of racial discrimination in the promotion and separation actions. He recommended reinstatement in the Washington position.

This was satisfactory to neither side and both sides appealed. The last thing plaintiff wanted was to be reinstated in Washington. The Agency said Mr. Burton's refusal of the Washington job destroyed his usefulness. It was absolute and not contingent on his being satisfied in the particulars stressed by the Regional Director of CSC as reasons for reinstatement.

The CSC Board of Appeals and Review reversed the Regional Director and sustained the removal of Mr. Burton. It considered the question of discrimination so far as it related to the promotion and removal actions. It found that the first was due not to discrimination but to Mr. Burton's behavior on the Philadelphia job, particularly his refusal to perform assigned work. The second was due not to discrimination but to his refusal to report in Washington as lawfully ordered.

Plaintiff had now exhausted his administrative remedies with respect to the order to duty in Washington and his disobedience thereof. The case is now ripe for judicial review of the decisions of the Post Office Department headquarters and the CSC in that regard. Plaintiff never did exhaust his administrative remedies with respect to alleged discrimination against him in the Philadelphia Regional Office, and the decision with respect thereto is not before us. However, the "lack of rapport" in that office and its causes are before us to the extent they can be connected up and shown to be relevant to the issues we must decide, and not otherwise. For reasons that follow, we deem the findings and rulings before us to be lawful,

supported by substantial evidence, and not arbitrary or capricious.

The questions for our decision can be divided up into those which do not relate to the color of plaintiff's skin and those which do. We take up the former first.

Plaintiff says—it seems his principal argument—that his "tenure" immunized him against being shifted to another duty station except with his consent. He points out that in filling out his application for employment on Standard Form 57 he checked the box "no" on a question whether he would be willing to serve in Washington, D. C. (Strangely, defendant denies this, though it plainly appears on photo-copies of the Form supplied with the administrative record.) However, 5 C.F.R. 335.102 delegates to agencies the power to reassign employees. Federal Personnel Manual, Chapter 715, Subch. 3 authorizes separation of employees who refuse to accept reassignment to different geographical areas. The record shows that some Federal agencies do not so reassign employees except with their consent, as a matter of internal policy. We have therefore searched the Postal Manual in case the Department might have promulgated some such self-denying ordinance, but find nothing. In Louks v. United States, 395 F.2d 993, 184 Ct.Cl. 361 (1968); and in Madison v. United States, 174 Ct.Cl. 985 (1966), cert. denied 386 U.S. 1037, 87 S.Ct. 1481, 18 L. Ed.2d 601 (1967), we recognized that agencies have power to effect geographical reassignment of employees, except as self-limited.

39 U.S.C. § 3105 provides that "detail" of employees between the departmental and field service may be made with the employee's consent and not for over a year. As pointed out above, the departmental and field services have different grade levels and pay scales. It would be anomalous for "detail" procedure to be indiscriminately invoked to cause employees subject to the two systems to work side by side. So far as appears, § 3105 is worded as it is to force permanent change of duty station to be

effected, as here, by change of appointing office, rather than by detail. It is well known that Form 57 is to inform appointing officers, not to embody a contract of employment. To the extent plaintiff may have derived from the Form 57 his impression that he was legally immune from reassignment, it is perhaps regrettable the form does not make the situation more clear, but none of us can see in it any basis for a legal argument.

Since the oral argument defendant has supplied us with further citations. The "promotion" authorized by 5 C.F.R. 335.102 includes a transfer from the Postal Field Service, paid under Title 39, Chapter 45, of the United States Code, to a General Schedule position, at a pay increase. 5 C.F.R. 531.202(k). Such a reassignment does not impair the employee's status or tenure, whatever that may be. 5 C.F.R. 335.101(a) and (b). We are convinced that the "tenure" on which plaintiff relies neither immunized him from the reassignment here involved nor was diminished by it.

It is, however, pointed out, not by plaintiff, that a person may be immune from a promotion, except with his consent, even if not immune from a lateral transfer to another geographical location. Plaintiff could not make this argument because he sees his reassignment as a demotion to which, if so, entirely different considerations would apply. We may concede, *arguendo*, that a promotion often involves incidents that in fairness, ought not to be foisted on a person without his consent. It may involve supervision of others, which produces psychic stresses in many people. It may involve more onerous duties. A person doing an acceptable job in a lower grade, might fear that in a higher one his work would not measure up, leading perhaps to forced separation. It may be possible to erect upon the Federal merit system, with its provisions for job security, an implied prohibition against such unconsented promotion. However, the delegation by the CSC to the agencies, 5 C.F.R. 335.102–103, delegates the power to promote with only the proviso that an acceptable "Promotion Plan" be complied with.

According to the testimony of the Departmental Personnel Director, plaintiff's reassignment was in no way a promotion except in the single sense that it involved a pay increase. According to U.S. Postal Manual, § 716.214, this factor alone causes the transaction to be defined as a promotion, regardless of any other. The Director regarded the new headquarters position in Grade GS–14 the nearest possible equivalent of the old field position at Level 15. The duties were not more onerous. The purpose of the definition was to indicate when the published "Promotion Plan" must be followed. It was followed here. There is nothing to show that the authors of the regulation intended it to control the legal incidents of a reassignment in any other context. If we should deduce a legal rule against promotion of status and tenure employees without their consent, we should first determine the reasons for such a rule and apply it only when the reasons for applying it exist.

The way the "Promotion Plan" reads, it seems that if there were qualified applicants within reach, one of them would have had to be selected, and thus the exclusion of non-applicants would have been automatic. Here, however, there were no applicants and thus no exclusion of non-applicants.

Plaintiff sees the Washington job as a demotion because it involved no supervision of others while, as he saw it, the Philadelphia job did. The factual basis for this latter belief is dubious, as will appear. Plaintiff did not read the job description for the Washington job until October, 1966, and what its incidents were he did not investigate while adamantly refusing to accept it. It has long been policy not to compare jobs in terms of whether they involve supervision of others, for the obvious reason that it is undesirable to add any incentive to the normal operation of Parkinson's laws, in the building up of unneeded assistant staffs. A person may not

be penalized for doing his job all by himself if he can.

To the Commission and again here, plaintiff urged that if he had to be fired, it was done in his case by the wrong employing office at the wrong place. Apparently his view is that a reassignment or change of duty station is like a marriage, not in effect unless consummated. Because he never reported to Washington, he deems he was never employed there and could not be fired from there. Before the Commission, which has reinstatement powers, this distinction had importance. The Commission had to deal with it and did, finding that he was effectively reassigned despite not reporting, and therefore his reinstatement if any had to be at Washington. Before us, possessing as we do no reinstatement powers, the distinction is sterile and not related to denial of any substantial right. If instead of firing plaintiff, headquarters had ordered the Regional Director to do it, plaintiff would have been in no way ahead. Only if we had to ascertain back pay under Rule 47(c), would it be necessary to find what job plaintiff last held. As of the present, it does not look as if the case will reach that stage.

We turn now to the issue of racial discrimination. As we have seen, the decision to reassign plaintiff to Washington was due to three factors, one of which was "lack of rapport" with the Philadelphia officials. Plaintiff interprets this as meaning that for racial reasons he was not acceptable at the Regional Office and that his complaints of racial discrimination accentuated the "lack of rapport". If this were true, it would no doubt follow that under EO 11246, removal of plaintiff from the scene was not a legally acceptable solution of the problem. But the CSC found that the evidence was to the contrary. We interpret the opinion of the BAR as finding in effect that the "lack of rapport" was due to actions on plaintiff's part, creating a situation that would have been intolerable as to any em-

ployee, white or black. We agree. The development of "lack of rapport" in such a situation is not racial discrimination and does not trigger the application of EO 11246.

The cognizant officials in Washington knew, because plaintiff had written to tell them, that beginning about February 8, 1966, he had refused to accept any more assignments of the type that had been the staple of his work since he was first employed. This was on the alleged ground the assignments did not agree with his job description. On the other hand, the agency did not give plaintiff the assignments he held the job description entitled him to have. Therefore, he simply sat at his desk doing practically nothing but draw his pay check. Up to May 19, the date of the reassignment order, the Regional Director had displayed his possession of no resource that could end the impasse and get plaintiff back to work.

The dispute related to plaintiff's job, as it had previously been, of inspecting postal facilities under construction or alteration. Plaintiff had done it in person, at least within the limits imposed by his continuing reluctance to travel. He contended his job description gave him the right to demand that he be assigned aides or assistants to do this work under his overall supervision. The pertinent language of the job description appears to be this:

\* \* \* \* \* \*

(C) \* \* \* Reviews and recommends approval of \* \* \* completed work \* \* \*. Supervises inspection and acceptance or recommendation actions for construction of new and remodeled buildings.

\* \* \* \* \* \*

This is somewhat ambiguous and plaintiff could have interpreted the language as he did in good faith. However, the Agency, in its ruling not here reviewable, held that the assigned work was within this job description, and in any case there was no racial discrimination because under an identical job descrip-

tion, plaintiff's predecessor, a Caucasian, had been assigned similar work.

■ There is no illegality in assigning work clean outside the job description. U.S. Postal Manual § 714.32, reads in part:

\* \* \* \* \* \*

a. Occasionally as the needs of the service require, an employee may be assigned to perform duties other than the duties and responsibilities specifically set forth in his position description, without change in level, compensation, and responsibilities; \* \* \*

Plaintiff was thus protected against demotion if he accepted work below his grade level. The office was empowered to give him such work and he was insubordinate in refusing to do it.

· ■■ The job description is an essential tool of management in fulfilling the policy of the Civil Service laws which demands Government-wide equality of pay for equal work. As it is an esoteric document written by specialists for specialists, a layman substitutes his own interpretation for the official one at some risk of error. It is not written to inform the employee what orders he can disobey. The description is used by classification experts in assigning grades or levels to jobs. It is the responsibility of management to keep it accurate. If management discovers a discrepancy between the description and the job, it must eliminate the discrepancy, but it can do this by changing, at its election, either the description or the duties. The employee has no right to demand, therefore, that the change be in the duties.

In spring 1966, it was recognized that plaintiff's job description was a mistake. Another staff assistant in the Engineering Branch had a job description that was identical. For that small office, these two purporting to have supervisory responsibilities, three with the Chief Engineer, made for too many chiefs in relation to the number of Indians. A revision of plaintiff's job description was in preparation. Meanwhile, management assigned the supervisory duties, such as they were, to the other man. Plaintiff said this other man was ignorant and incompetent, but at least he had the advantage in Government experience and seniority over plaintiff.

Job descriptions that exaggerate or invent high-level responsibilities, and minimize or conceal low-level ones, are not uncommon. Usually they are written thus to permit higher classification and pay, making the job more competitive with like jobs in private industry. The evidence does not show whether this occurred here. In any case, the Region blundered badly, contributing to the impasse, when it put a man, as sensitive about his rights as plaintiff, to work under an incorrect job description.

Whatever more may be said of plaintiff's work-stoppage—he was not the first, and will probably not be the last, to lose his head and run amuck in the bureaucratic maze—it cannot be gainsaid that here was a situation that demanded correction, that the mode of correction proposed, plaintiff's promotion and change of duty station, was more than fair to him, and that it embodied no taint of racial discrimination.

There were many other causes for "lack of rapport". We leave them unmentioned here because they did not cry so loudly for correction on the pertinent date of May 19, 1966, because they were not all so clearly proved to have been known to the officials at Washington, and because, as Mr. Niles pointed out, exploration of them in depth is irrelevant and could not but be prejudicial to plaintiff's case.

Plaintiff's counsel, however, argued that despite the denials in the testimony, there must have been some kind of message from the Regional Office to headquarters asking that plaintiff be taken off their backs. If this thesis be accepted, then the alleged discriminations in the Region can be imputed to the headquarters officials who effected the reas-

signment, and they will all have to be gone into. The answer is that no such message can be postulated. If plaintiff was half as bad an employee as the Region documents make him appear, and if the Region wanted to rid itself of plaintiff, it had ample grounds and means for doing so. It did not need help from headquarters. Why it did not act is one of the puzzles of the case. We have in the record a series of urgent warnings and admonitions, received by plaintiff with sullen defiance, and no follow-up. If plaintiff had come to attach no weight to the disapprobation of the Region or to attribute it to the indefensible ground of racial prejudice, that must have seemed small matter for wonder. It looks as if headquarters got tired of waiting for the Region to act and decided to assume jurisdiction *sua sponte*. It would if possible employ plaintiff usefully, and only if impossible, get rid of him. In giving notice of its decision it extended to the Regional Director the same scant courtesy as it did to plaintiff. Thus the testimony that the action was on headquarters' initiative is in no way refuted or impeached by the attendant circumstances.

We recognize that our analysis of the case might all be valid and still there might be a triable issue of fact. This would be the case, e. g., if plaintiff intended by oral testimony, his own or that of others, to contradict, explain, or modify the story that emerges so plainly from the record. The trouble is, under Rule 64, plaintiff is required, in opposing the motion for summary judgment, to set forth specific facts showing there is a triable issue. To reiterate, the decision to promote plaintiff was made in Washington and not discussed with the Region. The officials concerned with the decision came before the Appeals Examiner and explained it in the sworn testimony summarized above. Plaintiff's counsel cross-examined them. Neither then nor since has plaintiff shown he has anything to explain or refute this history. He wants rather to rehash the irrelevant and for him suicid-

al story of his Philadelphia employment. Plaintiff has put before us now a list of no fewer than twenty persons who, he says, have "repudiated" some of his Federal employment rights, "for the purpose of racial discrimination." This includes three of the Justice Department attorneys responsible for this case. It includes Mr. Niles, the hearing Examiner who leaned over backwards to protect his rights, and Mr. Ryder, the CSC Regional Director who recommended that he be reinstated. Such scattershot accusations have no place or meaning in a court of law.

In all this lengthy record there is no evidence that any person or persons concerned with the promotion of plaintiff, his separation from service, and the review by the CSC, acted with a racial bias against plaintiff. In Madison, supra, 174 Ct.Cl. at p. 989, we said that *imputations of bad faith or malevolence* by the employee against management preclude summary judgment and raise a triable issue "if plaintiff has shown enough to call for a trial on that issue." It is our considered judgment here that plaintiff has not shown enough, or indeed, anything at all. There has been a full testimonial hearing, which is a factor we rely on in reaching this result.

Subsequent to the oral argument plaintiff filed a motion, the purpose of which was to obtain timely compliance by defendant with certain commitments made during oral argument. Defendant appears to have satisfied both its commitments and what plaintiff asks for. To show formal action on the motion, we record it as granted.

Since plaintiff's reassignment to Washington and separation from service on his refusal to report there were lawful, and since they were not motivated by racial discrimination contrary to EO 11246, plaintiff is not entitled to recover. Defendant's motion is granted and the petition is dismissed.

DAVIS, Judge (dissenting):

The Post Office Department characterized plaintiff's transfer from Phila-

delphia to Washington as a "promotion", both in the Postal Manual and in the formal Notification of Personnel Action. The Civil Service Commission also treated it as a "promotion".[1] I think we should take the agencies at their word, especially since this description put the Department in a position to tell inquirers that Mr. Burton, whose case had become a minor *cause célèbre* because of its racial overtones, was not being adversely affected or penalized,[2] but was actually being given a better job. We should not take it upon ourselves to decide that, despite what the Post Office and the Commission have formally said, plaintiff was not in fact promoted.

A promotion, in my view, does not fall under the provisions of the Federal Personnel Manual authorizing separation for failure to accept a "new assignment". Federal Personnel Manual, ch. 715, subch. 3, § 3–1.a. That regulation does not refer in terms or by necessary implication to promotions, but solely to a "new assignment". As the court indicates in its opinion, there can be a world of difference between a compulsory transfer at the same grade and an involuntary promotion. Forcing an employee to take a promotion against his will— with the sanction of removal if he refuses—is a concept heretofore unknown to the federal civil service. It should take explicit language in the regulation to show that promotions-without-consent are to be included in the general coverall of a "new assignment". Accordingly, I would hold that under the applicable regulations the Government had no right to order plaintiff to go to Washington against his wish to take the job given him there.

This position requires me to face the problem of whether plaintiff should

have acquiesced (under pressure) in the promotion and fought the transfer after he had gone to Washington. See Madison v. United States, 174 Ct.Cl. 985, 992 n. 4 (1966), cert. denied, 386 U.S. 1037, 87 S.Ct. 1481, 18 L.Ed.2d 601 (1967). In the circumstances of this case, I think not. Congress has laid down, in 39 U.S.C. § 3105 (1964), a special policy for transfers between the field and departmental services of the Post Office Department:

> *With the consent of the employee,* the Postmaster General may detail any employee, including an employee of the departmental service, between the postal field service and the departmental service to such extent as may be necessary to develop a more efficient working force and more effectively to perform the work of the Department. Each detail shall be made for a period of not more than one year and may be made without change in compensation of the employees so detailed (emphasis added).

This strong statutory policy of requiring the employee's consent to a detail to Washington (which could last as long as a year) leads me to conclude that plaintiff was not required to take himself and his family to the District of Columbia, against his will, in order to contest his promotion. Congress seems to me to have recognized the hardship of such an involuntary dislocation which could well be temporary, for if plaintiff prevailed he would have to move back to Philadelphia just as if he had been on detail.[3]

The upshot, for me, is that plaintiff's separation was invalid. He has not moved for summary judgment, but to expedite the disposition of litigation we have granted judgment in favor of a non-moving party where the relevant

---

1. Both the Department and the Commission added that the personnel action was likewise a "change in appointing office", abbreviated as "CAO".

2. The Commission's Board of Appeals and Review said in its decision that "[a] promotion and CAO is not an adverse action within the meaning" of

the Commission's regulations providing for review of agency action detrimental to an employee, though the Board did undertake to review the procedures.

3. I need not consider whether 39 U.S.C. § 3105 bars, by implication, a permanent involuntary assignment from the field to the departmental service.

facts are clear and his right to recover appears on the record. See Aircraft Associates & Mfg. Co., Inc. v. United States, 357 F.2d 373, 380, 174 Ct.Cl. 886, 898–899 (1966).

LARAMORE and DURFEE, JJ., concur in the foregoing dissenting opinion.