SYSTEMS TECHNOLOGY ASSOCI-
ATES, INC., Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 46–81.

United States Court of Appeals,
Federal Circuit.

Feb. 18, 1983.

Edward F. Canfield, Washington, D.C., for appellant. With him on the brief were Joseph D. Crumlish and Casey, Scott & Canfield, P.C., Washington, D.C.

Mary Mitchelson, Washington, D.C., for appellee. With her on the brief was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C.

Before MILLER, SMITH and NIES, Circuit Judges.

EDWARD S. SMITH, Circuit Judge.

This case presents a question of Federal Government contract law: whether a settlement agreement between a contractor and the Government should be set aside for duress or coercion in light of the contractor's precarious financial condition at the time the settlement agreement was reached. The contractor, Systems Technology Associates, Inc., appeals the February 19, 1981, decision of the Department of the Interior Board of Contract Appeals (board),[1] dismissing the contractor's claim that the settlement agreement should be set aside. While we do not fully endorse the board's analysis, we do find that the settlement was not induced by coercion or duress. We, therefore, affirm the decision of the board.

## I.

Systems Technology Associates (STA) entered into a contract with the Environmental Protection Agency (EPA) on August 15, 1974. STA agreed to supply computer equipment to EPA's Ann Arbor, Michigan, laboratory for the fixed price of $1,302,993. At the Government's behest, the contract was modified several times between May and December 1975. With no agreement on schedule and price adjustments, STA stopped work and, on March 8, 1976, EPA terminated the contract for default.

The contractor's appeal of the default termination was sustained by the board. In its January 19, 1978, decision,[2] the board converted the default termination to a termination for convenience and required the Government to equitably adjust the contract. STA's constructive change order claims were denied without prejudice and remanded to the contracting officer.

On February 14, 1978, the parties met and STA suggested that the settlement be

---

1. *Systems Technology Assocs.*, 81-1 B.C.A. (CCH) ¶ 14,934, *rehearing denied*, 81-1 B.C.A. (CCH) ¶ 15,084.

2. *Systems Technology Assocs.*, 78-1 B.C.A. (CCH) ¶ 12,969.

on a "total cost" basis. STA submitted a termination settlement proposal.[3] In evaluating that proposal, a Government auditor requested and was denied access to STA's books on June 5, 1978. The parties met and discussed their disagreements over the use of the total cost basis methodology, favored by the Government, and over Government access to STA's books.[4]

Subsequently, STA resubmitted its claim, protesting the Government's insistence on a total cost basis settlement and agreeing under protest to make cost records available to Government auditors.

The auditors, however, insisted on using STA's job cost ledgers. STA again protested. The auditors finally concluded that, because of STA's failure to make the job cost ledgers available, the field audit office could not render an opinion on STA's settlement proposal.

This dispute over methodology and access to the job cost ledgers continued until October 4, 1978, when STA submitted under protest a settlement proposal prepared on a total cost basis and allowed the auditors access to its job cost ledgers. STA's total cost basis settlement proposal requested an additional payment of $2,718,448.[5]

During the period of this dispute, STA was under financial pressure from its bank and a principal contractor, Xerox. The record is clear that the Government was at least aware of STA's precarious financial position.

The audit report was delivered to the Government in mid-January 1979. Following discussion of the Government's refusal to supply a copy of the audit report to STA,

the parties met on February 8, 1979, at which time the Government offered a total settlement payment of $798,952. The contractor rejected the offer claiming that the Government's strategy was to place STA under duress to force a reduced settlement.[6] Another negotiation meeting was held February 22, 1979, but no progress was made.

The Government eventually relented on the issue of making the audit report available; on March 7, 1979, STA received a copy of the audit report. The audit report questioned $2,235,056 of STA's $4,696,968 total cost basis settlement claim. Only $2,461,912 of contractor's claim was established by the auditors as verified costs.

It was against this background of financial pressure and disputes over settlement methodology and access to records that the parties met on March 16, 1979. Xerox had offered to waive interest on its claim against STA if full payment was made by that date. The Government was fully apprised of this offer.

Although STA requested a speedy settlement, almost 14 months had elapsed since the board ordered equitable adjustment of the contract. Much of this time was consumed by the disputes discussed above. STA was finally forced to accept the Government's position on both points in order to advance the negotiations.

Unable to move the Government in the March 16 meeting, STA's president accepted a total settlement in the amount of $1,200,639, citing his inability to pursue the matter further due to the company's precarious financial condition.

On June 11, 1979, STA appealed to the board, asking that the March 16 settlement

---

**3.** STA's May 9, 1978, termination settlement proposal was prepared using Federal Procurement Regulation 1–8.307–2(c), 41 C.F.R. § 1–8.307–2(c), for guidance. The proposal was *not,* however, prepared on a total cost basis.

**4.** The contractor had apparently reversed its earlier position on the use of the total cost basis methodology—which the contractor had initially suggested—in favor of the percentage of contract completion methodology.

**5.** The proposed payment was for a net total cost basis settlement amount of $4,056,211,

less progress payments received by STA in the amount of $1,337,763 for a net payment of $2,718,448.

**6.** The contractor's rejection, embodied in a February 15, 1979, letter, identified several of STA's objections to the Government's offer: wide disparity between the parties over the amount of the settlement; STA's precarious financial position; bad faith on the part of the Government; and deliberate delay to benefit from STA's adverse financial condition.

be set aside on the grounds that it was procured by duress, coercion, and such arbitrary action as to be tantamount to fraud. The board determined that duress was not established. STA's request for reconsideration of the board's February 19, 1981, decision was denied.

STA then appealed to this court, requesting reversal of the board's February 19, 1981, decision.

## II.

The sole issue raised by this appeal is whether the board erred in determining that the settlement agreement should not be set aside for coercion or duress. In arguing that this court should set aside the settlement agreement, STA contends that the board erred in articulating the applicable legal standard and in applying that standard to the facts before it. The Government defends the board's decision as reasonable, thorough, and legally correct.

██ In reviewing the determination of the board we must decide whether, with respect to the facts, the board's decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. The legal conclusions of the board are freely reviewable by this court.[7]

## A.

We look first to the board's articulation of the standard of what conduct constitutes economic duress:[8]

The essential elements of economic duress are summarized by Nash and Cibinic in Federal Procurement Law (1969 ed., p. 208) as: (1) A person compels another to assent to a transaction against his will; (2) such assent is induced by wrongfully threatening action the person has no legal right to take; and (3) the threatened action, if taken, will cause irreparable damage to the other person. * * *

Focusing on the second of Nash and Cibinic's elements, the board went on to state that duress requires a wrongful act or an act the Government is not legally empowered to take. While the board did not require that the act be illegal per se,[9] it focused on "whether the actions were legally permissible actions under the contract and the applicable regulations."[10] The findings that the Government had not acted illegally and had acted within its legal rights under the contract were considered by the board to be dispositive of the propriety of the Government's actions.[11]

In evaluating the board's articulation of the standard of duress, we do not write upon a clean slate. The United States Court of Claims, one of the two predecessor courts to this court,[12] has established standards for determining when duress will render an agreement void. In *Louisiana-Pacific Corp. v. United States*,[13] the Court of Claims, denying both parties' motions for summary judgment, set forth the test for duress. The Government, seeking to secure

---

7. The Government questions whether this appeal properly arises under the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.* (Supp. V 1981), rather than under the Wunderlich Act. The standard of review under the Contract Disputes Act is the same as the prior standard of review under the Court of Claims' Wunderlich Act review procedures. We find it unnecessary to rule on the jurisdictional issue raised by the Government in the instant case.

8. 81–1 B.C.A. at 73,913.

9. Indeed, if the board meant to say that, to constitute economic duress, the Government's action must have been illegal (that is, *beyond* or in contravention of its statutory authority), then we must disagree.

10. 81–1 B.C.A. at 73,915.

11. While the board does not require that an act be illegal to constitute duress, it relies on the bare legality of the Government's actions in finding no duress.

12. In *South Corp. v. United States*, 690 F.2d 1368, 1370, 215 USPQ 657, 658 (C.A.Fed.1982), the Court of Appeals for the Federal Circuit adopted the rulings of the Court of Customs and Patent Appeals and the Court of Claims as precedent for the new court.

13. *Louisiana-Pacific Corp. v. United States*, 656 F.2d 650 (Ct.Cl.1981).

a modification of a timber sales contract, threatened cancellation of the contract if the contractor did not accept the Government's proposed modification. The contractor signed the modification and subsequently sued to void it, alleging, *inter alia,* that it was a victim of Government duress.[14]

[P]laintiff says duress upon it renders the modification void. If so, there was no accord and satisfaction or waiver which defendant relies upon. Thus, there is presented a disputed question of fact we cannot resolve on the pending motions. This may be seen clearly when we consider the three tests for identifying duress as set forth in *Fruhauf S.W. Garment Co. v. United States,* 126 Ct.Cl. 51, 111 F.Supp. 945 (1953), and in many subsequent cases, as follows:

(1) One side involuntarily accepted the terms of another.

(2) Circumstances permitted no other alternative.

(3) The circumstances were the result of coercive acts of the opposite party.

The court went on to refine the doctrine of "economic duress," emphasizing the lack of a reasonable alternative: [15]

The point may be illustrated by the following language from our recent decision in *Johnson, Drake & Piper, Inc. v. United States,* 209 Ct.Cl. 313, 321–23, 531 F.2d 1037, 1042–43 (1976). There the court said:

"Economic pressure and 'even the threat of considerable financial loss' are not duress. *International Tel. & Tel. Corp. v. United States,* 206 Ct.Cl. 37, 52, n. 11, 509 F.2d 541, 549, n. 11 (1975). 'Economic duress may not be implied merely from the making of a hard bargain.' *Aircraft Associates & Mfg. Co., Inc. v. United States,* 174 Ct.Cl. 886, 896, 357 F.2d 373, 378 (1966). The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions. *Fruhauf Southwest Gar-*

*ment Co. v. United States, supra,* 126 Ct.Cl. at 62, 111 F.Supp. at 951. 'Some *wrongful conduct must be shown,* to shift to defendant the responsibility for bargains made by plaintiff under the stress of financial necessity.' *LaCrosse Garment Mfg. Co. v. United States,* 193 Ct.Cl. 168, 177, 432 F.2d 1377, 1382 (1970)." [Emphasis supplied.]

In *David Nassif Assocs. v. United States,*[16] the Court of Claims, as STA points out, articulated the liberal Restatement view of the law of duress:

To render an agreement voidable on grounds of duress it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save to agree. * * * [I]ncluded are threats that would accomplish economic harm[,] * * * threats that would breach a duty of good faith and fair dealing under a contract as well as threats which, though lawful in themselves, are enhanced in their effectiveness in inducing assent to unfair terms because they exploit prior unfair dealing on the part of the party making the threat. Restatement (Second) of Contracts § 318(1)(d) and § 318(2)(b) (Tent.Draft No. 11, April 1976).

To the extent that it limits the coercive act to one in contravention of law, regulation, or contract, the board's opinion treads heavily on the tests of duress previously articulated by the Court of Claims. We cannot endorse either the board's fine metaphysical analysis of illegality or its reliance on the bare legality of a Government act as dispositive of its wrongfulness.

The above cases have done away with the requirement of an illegal act, focusing instead on the coercive nature of the act as dispositive of its "wrongfulness." The standard now looks more closely at the defeat of the will of the party coerced. An act the Government is empowered to take

14. *Id.* at 652.

15. *Id.* at 653.

16. *David Nassif Assocs. v. United States,* 644 F.2d 4, 12 (Ct.Cl.1981).

under law, regulation, or contract may nonetheless support a claim of duress if the act violates notions of fair dealing by virtue of its coercive effect.

STA previously presented, in its petition for rehearing,[17] its claim that the board misstated the law. While the board's articulation of the standard of duress lacks the precision and accuracy of the above cited cases, in view of both the original and the rehearing opinions, we cannot say that the board committed reversible error. The board's February 19 opinion places undue emphasis on the fact that the Government had acted within its legal rights; however, the board in its rehearing opinion did bring its consideration more properly in focus on the nature of the alleged coercive acts. While we note that the board's listing of wrongful acts that may constitute duress— acts taken in bad faith, or with malice, or with unconscionable motives—is by no means comprehensive, we fully agree with the board that the evidence in this case does not establish duress.[18]

### B.

We turn now to the application of the above standards to STA's factual contentions. These contentions center on the board's findings with respect to delay, STA's financial condition, evidence of bad faith in negotiation, payment of STA's verified costs, and the use of total cost basis methodology in settling STA's claim.

STA's primary contention is that the Government deliberately delayed in order to benefit from STA's financial condition. STA, therefore, strongly contests the

board's finding that STA was responsible for much of that delay. The key question with respect to delay is not the precise quantum of delay attributable to STA but, rather, whether delay that may be used in a coercive manner is attributable to the Government.

The board, in its February 19 opinion, addressed STA's allegations of Government delay in terms of the availability of the job cost ledgers and the audit report. On rehearing, the board identified the period of delay attributable to STA for STA's failure to make the job cost ledgers available[19] to be 4 months. The board found that the only period of delay attributable to the Government was the 5- to 6-week period from late January 1979 until March 3, 1979, during which time the Government refused to provide STA with a copy of the audit report. The remainder of the 14-month negotiation period, the board determined, was not attributable to either party but, rather, was needed to perform the audit and was taken up by negotiations between the parties.

Only that delay attributable to the Government is relevant to disposition of the claim that the Government exerted duress through deliberate delay. We cannot say that the board's finding that the Government was responsible for only 5 to 6 weeks of delay was fraudulent, or arbitrary, or capricious, or so grossly erroneous as necessarily to imply bad faith, or was not supported by substantial evidence. That period of delay is not sufficient to establish duress in light of the circumstances sur-

---

17. *Systems Technology Assocs.*, 81–1 B.C.A. (CCH) ¶ 15,084.

18. In those cases in which duress was found to exist, a much stronger evidentiary showing was made. *See, e.g., Aircraft Assocs. & Mfg. Co. v. United States*, 357 F.2d 373, 174 Ct.Cl. 886 (1966) (duress established with respect to release under sales contract where Government knew of scavenging of subject matter, settlement offer was disproportionate, and Government demanded immediate settlement).

19. The board, in its February 19 opinion, attributed to STA delay from January 1978 until October 1978 for failure to allow examination of the job cost ledgers. On rehearing, that finding was corrected to identify the actual period of delay attributable to STA as only 4 months. The period of delay is properly calculated from June 5, when STA refused to allow Government auditors access to the job cost ledgers, until October 4, when STA submitted its total cost basis settlement proposal under protest, allowing Government auditors access to its job cost ledgers.

rounding the negotiation of the settlement agreement in this case.[20]

Second, STA argues that the Government was aware of, had caused, and had used the contractor's precarious financial condition to coerce a settlement. STA's precarious financial condition is well documented in the record and was recognized by the Government.

STA, however, does no more than assert causation and the Government's coercive use of the circumstances to secure a settlement. The record is totally devoid of proof of either count. We agree with the board's assessment that the record does not support STA's second claim.

The third factual contention of STA in this appeal is that the board erred in allowing EPA to insist on total cost basis methodology and in ignoring evidence of bad faith on the part of EPA in the application of that methodology. STA argues that the total cost basis methodology is not appropriate for an equitable adjustment and that the board erred in allowing EPA to apply it rigidly.

The administrative record of the board's opinion contains the minutes of a meeting between STA and EPA held on February 14, 1978. Those minutes, prepared by STA, detail that it was STA who first suggested the total cost approach. The record indicates that the parties' disagreement over the use of that methodology did not arise until May or June 1978.

We do not wish in this case to enter the debate over which costing method is most appropriate. Suffice it to say that STA suggested the total cost basis methodology and, when it later decided to contest that understanding, settlement methodology became a matter for negotiation between the parties. The record does not support STA's claim that it was coerced by the use of that methodology.

Under its fourth challenge, bad faith, STA alleges that the Government did not pay STA those costs verified by the audit:

> The Defense Contract Audit Agency ("DCAA") analysis of costs was unable for various reasons to audit $2,235,056 of STA's claims of $4,696,468 which would have allowed a settlement of $2,460,812.

Yet, the record supports the finding that STA had already received $1,406,844 in progress payments prior to the termination of the contract for default.

At oral argument, the parties were requested to stipulate whether STA's total cost basis claim of $4,696,968 [21] included the amounts already tendered as progress payments. The Government, in its post-argument submission, correctly points out that the total cost basis claim of $4,696,968 does include progress payments in the amount of $1,406,844, paid prior to termination.

In analyzing STA's bad faith claim, a simple calculation [22] is most helpful:

**20.** STA also contends that the board neglected relevant evidence by giving undue attention to the allocation of delay to STA. While we cannot endorse the board's handling of this evidentiary issue, we find nothing in the record that would alter the result. STA makes no showing in the record and proffers no specific facts, ignored by the board, that would constitute duress. The board appears to have given only passing consideration to several Government acts alleged by STA to constitute duress, on the grounds that the delay was attributable to STA.

**21.** The $4,696,968 figure is the amount audited by the Defense Contract Audit Agency. Appellant's brief does not disclose how STA arrived at the lower figure. On November 8, 1982, the parties filed post-argument submissions in this court, but were unable to agree on the inclusion of progress payments in the total cost basis claim. STA concluded that it is impossible to determine what part of the progress payments were characterized by DCAA as verified. On its face the statement is true—yet unresponsive to the question. We view the audit in terms of the basis on which it was performed—total cost—and not on the basis of the time at which payment was made or the name given to those payments by the parties. Our analysis does not assume that all progress payments were verified, but seeks only to determine if appellant received an amount less than its verified costs in settlement in order to determine if the Government settled the claim in good faith.

**22.** There is confusion in the record over some of the amounts involved in the claim. For purposes of this calculation, the amounts most favorable to appellant have been used.

Amounts claimed by STA

DCAA audit

| | | |
|---|---|---|
| Total cost basis settlement claim | $4,696,968 | |
| Less amounts questioned | (2,235,056) | |
| Verified costs: | | $2,461,912 |

Amounts received by STA

| | | |
|---|---|---|
| Progress payments under contract | $1,406,844 | |
| Paid under 3–16–79 settlement agreement | 1,200,639 | |
| Total received by STA under contract and 3–16 settlement: | | $2,607,483 |

| | |
|---|---|
| Amount received by STA in excess of verified costs: | $145,571 |

STA therefore received, in settlement and through progress payments, $145,571 in excess of its verified costs. If the Government had failed to pay at least the amount of verified costs, STA's bad faith argument would be much stronger.[23] Such is not the case however. The contractor received payments in excess of its verified costs. Absent other facts establishing duress, in a situation such as this, where the contractor has received amounts in excess of its verified costs, bad faith is not established.

STA's final factual challenge is to the board's failure to award damages for amounts based on modifications, for constructive changes to the contract, and for the constructive conversion of its contract from a fixed price to a cost reimbursement contract. Under this rubric, STA essentially contests no more than the practical impact of a total cost basis settlement. These claims are subsumed under the total cost basis settlement methodology accepted by STA and do not constitute duress. Absent facts of record establishing duress we cannot upset the settlement agreement on the basis of this claim, despite the bitter flavor of that settlement to STA. Finding no such facts of record we decline relief.

**23.** It is interesting to note that had STA accepted the Government's offer of February 8, 1979, the situation with respect to the Government's good faith may have been different. Accept-

## III.

In conclusion, the board's determination that the settlement agreement was not secured by coercion or duress on the part of the Government is affirmed. The contractor has failed to establish facts constituting duress under the applicable standards of duress. Additionally, the contractor has received in settlement and through progress payments amounts in excess of its verified costs under the contract.

AFFIRMED.

ance of that offer of $798,952 would have resulted in a settlement $256,116 smaller than STA's verified costs. *See* text accompanying note 6, *supra*.